Allegiance Telecom Inc. (ALGX)
Class Period: 4/24/01 - 2/19/02

EVENT CHRONOLOGY

| Date | ALGX Volume | ALGX Price | % Chg | Residual % Chg | Time | Source | Event |
|---|---|---|---|---|---|---|---|
| 6/30/2002 | | | | | | | (Cont'd) Allegiance's recent purchase of WorldCom's customer premise equipment provisioning and maintenance businesses for $30 million is expected to add incremental revenue of $30 million each quarter, of which $15 million can be applied to the bank covenant. While this additional revenue should provide a cushion to Allegiance to remain in compliance with the covenant, Fitch's concern is that without this purchase, in the coming quarters the company may have violated the covenants, as it is unclear to what extent the core business growth is slowing. By Fitch's estimates, the company will have less than $300 million in cash at the end of 2Q02, with $150 million still remaining undrawn on its credit facility. Since the company is not generating any cash flow at this time, it is apparent that if Allegiance did violate a bank covenant and was forced to pay back the $350 million outstanding balance on the facility, it would not have sufficient funds to do so. |
| 7/1/2002 | 1,045,700 | $ 1.43 | -21.9% | | | | |
| 7/2/2002 | 779,700 | $ 1.27 | -11.2% | | | | |
| 7/3/2002 | 2,142,700 | $ 1.20 | -5.5% | | | | |
| 7/5/2002 | 702,300 | $ 1.33 | 10.8% | | | UBS | Lowering rating to Sell with $0.50 price target. We now forecast cash deficits will lead to restructuring. |
| 7/8/2002 | 1,108,700 | $ 1.17 | -12.0% | | | | |
| 7/9/2002 | 559,300 | $ 1.18 | 0.9% | | | | |
| 7/10/2002 | 452,900 | $ 1.17 | -0.8% | | | | |
| 7/11/2002 | 833,500 | $ 1.22 | 4.3% | | | | |
| 7/12/2002 | 2,866,000 | $ 1.16 | -4.9% | | | | |
| 7/15/2002 | 681,300 | $ 1.09 | -6.0% | | | | |
| 7/16/2002 | 821,400 | $ 1.10 | 0.9% | | | | |
| 7/17/2002 | 737,600 | $ 1.08 | -1.8% | | | | |
| 7/18/2002 | 714,400 | $ 1.05 | -2.8% | | | | |
| 7/19/2002 | 1,302,700 | $ 1.10 | 4.8% | | | | |
| 7/22/2002 | 1,521,069 | $ 1.14 | 3.6% | | | | |
| 7/23/2002 | 767,652 | $ 1.11 | -2.6% | | | | |
| 7/24/2002 | 637,709 | $ 1.16 | 4.5% | | | CLS | Raising rating to Add from Hold with price target $3. Announced acquisition last month which will help keep revenue covenants at bay. |
| 7/25/2002 | 901,647 | $ 1.22 | 5.2% | | | | |
| 7/26/2002 | 1,914,990 | $ 1.21 | -0.8% | | | | |
| 7/29/2002 | 626,393 | $ 1.23 | 1.7% | | | | |
| 7/30/2002 | 1,244,845 | $ 1.50 | 22.0% | | 16:01 | PRN | Allegiance Telecom announces double digit sequential revenue growth and improved EBITDA and cash burn in 2Q. 2Q02 Revenues of $106.4 million, resulting in annual increase of 48.7 percent. Approx. $10 million improvement in EBITDA from 1Q02 with EBITDA loss margin reduced to 6.4 percent in 2Q02 from 13.4% in 1Q02 (before giving effect to charges related primarily to WorldCom exposure in 2Q02). Senior lender would like to look into modifying senior credit facility to place greater emphasis on profitability and cash preservation, with less emphasis on growth while also strengthening some of the restricted covenants in the facility. |
| 7/31/2002 | 2,682,421 | $ 1.23 | -18.0% | | 9:10 | William Blair | Allegiance posted solid 2Q results; revenue $184.4m, slightly below guidance of $185 million; expects to turn EBITDA positive late in 3Q Hold |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| OSCAR PRIVATE EQUITY INVESTMENTS, Individually And On Behalf of All Others Similarly Situated,<br><br>                                   Plaintiffs,<br><br>    v.<br><br> ROYCE J. HOLLAND and ANTHONY PARELLA,<br><br>                                   Defendants. | No. 3:03-CV-2761-H |

**JOINT AFFIDAVIT OF JOSEPH A FANCIULLI, REBECCA S. HANNAWAY, AND JOHN G. VONDRAS, REGARDING THE EXPERT REPORT OF PARAGON AUDIT & CONSULTING, INC.**

We, Joseph A. Fanciulli, Rebecca S. Hannaway, and John G. Vondras,

being over the age of 18, hereby state under the penalty of perjury that:

1.    Paragon Audit & Consulting, Inc. ("Paragon"), with Joseph A. Fanciulli,

Rebecca S. Hannaway, and John G. Vondras, has been retained by plaintiffs'

counsel in the above-referenced litigation to prepare an expert report in support of

plaintiffs' supplemental submission regarding class certification (the "Expert

Report").   A true and correct copy of the Expert Report is attached hereto as

**Exhibit 1**, and is incorporated herein by reference.

2.    Paragon provides a wide range of audit and consulting services, as well as market intelligence, to the domestic and international telecommunications industries.  Paragon's services range from assessment of internal controls and regulatory/policy compliance to solutions implementation.  This background is set forth in Section I.1 of the Expert Report.

3.    Mr. Fanciulli is the President Paragon.  Mr. Fanciulli has substantial experience in the telecommunications industry, including directing domestic and international auditing, security functions, investigating fraud, and overseeing compliance for major telecommunications companies.  His professional background is more fully set forth in Section I.2 of the Expert Report, and a true and correct copy of his curriculum vitae is attached hereto as **Exhibit 2**.

4.    Ms. Hannaway is the Director of Systems and Operation at Paragon.  Ms. Hannaway has over 20 years of experience in the telecommunications, cable and internet industries, with over twenty years of managerial experience in telecommunications systems development, network operations, risk management, and legal/regulatory compliance.  Her professional background more fully is set forth in Section I.3 of the Expert Report, and a true and correct copy of her curriculum vitae is attached hereto as **Exhibit 3**.

5.    Mr. Vondras serves as a Staff Consultant for Paragon.  Mr. Vondras has over

2

36 years of experience in the telecommunications and cable industries, including operations evaluation and improvement, engineering, customer service, human resources, as well as public policy and regulatory compliance. His professional background is more fully set forth in Section I.4 of the Expert Report, and a true and correct copy of his curriculum vitae is attached hereto as **Exhibit 4**.

Signed and sworn under penalty of perjury.

Dated this 31st day of October, 2007

_____
Joseph A. Fanciulli

Dated this 31st day of October, 2007

_____
Rebecca S. Hannaway

Dated this 31st day of October, 2007

_____
John G. Vondras

3

36 years of experience in the telecommunications and cable industries, including operations evaluation and improvement, engineering, customer service, human resources, as well as public policy and regulatory compliance. His professional background is more fully set forth in Section I.4 of the Expert Report, and a true and correct copy of his curriculum vitae is attached hereto as **Exhibit 4**.

      Signed and sworn under penalty of perjury.


Dated this 31st day of October, 2007

                                        Joseph A. Fanciulli


Dated this 31st day of October, 2007

                                        Rebecca S. Hannaway


Dated this 31st day of October, 2007

                                        John G. Vondras


3

36 years of experience in the telecommunications and cable industries, including operations evaluation and improvement, engineering, customer service, human resources, as well as public policy and regulatory compliance. His professional background is more fully set forth in Section I.4 of the Expert Report, and a true and correct copy of his curriculum vitae is attached hereto as **Exhibit 4**.

      Signed and sworn under penalty of perjury.

Dated this 31st day of October, 2007

                                                _____
                                                Joseph A. Fanciulli

Dated this 31st day of October, 2007

                                                _____
                                                Rebecca S. Hannaway

Dated this 31st day of October, 2007

                                                _____
                                                John G. Vondras

# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| OSCAR PRIVATE EQUITY INVESTMENTS, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ROYCE J. HOLLAND and ANTHONY PARELLA,<br><br>Defendants. | No. 3:03-CV-2761-H |

**EXPERT REPORT OF PARAGON AUDIT & CONSULTING, INC., BY JOSEPH A. FANCIULLI, REBECCA S. HANNAWAY, AND JOHN G. VONDRAS, IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL SUBMISSION REGARDING CLASS CERTIFICATION**

**I. Background and Qualifications of the Experts.**

1.       **Paragon Audit & Consulting, Inc.** ("Paragon") serves the domestic and international telecommunications, cable television, and technology business communities' audit and consulting needs, from controls and regulatory/policy compliance environment assessments to solutions implementation. We are operational and audit professionals with Regional Bell Operating Company, cable and telecommunications, technology and law enforcement experience. Our group has successfully addressed financial, operational, investigative and legal & regulatory compliance issues for clients throughout the United States, Europe and Asia.

1

2.     **Joseph A. Fanciulli, CFE, CPP.**

a.     Mr. Fanciulli has served as the President of Paragon since June 2003. His address is 300 Gulf Drive, Venice, FL, 34285. Mr. Fanciulli holds a BA in English from La Salle University and an MBA from the University of Phoenix. Prior to forming Paragon, Mr. Fanciulli spent 14 years working in the telecommunications industry, directing domestic and international audit, fraud, compliance, and security functions for U.S. West, MediaOne Group, and AT&T Broadband. Prior to his telecommunications work, Mr. Fanciulli had a 20-year career in law enforcement, serving as a police agent, detective and detective sergeant with the Lakewood (Colorado) Police Department. In those positions, Mr. Fanciulli specialized in the investigation of economic crime.

b.     Mr. Fanciulli has previously testified as an expert witness in the following cases: Jacobson v. Latin Quarter III, LLC; Landstar Investments v. Leroux; In re Estate of Meadoff; Gibson v. Bank of America; and Sunshine Mortgage Corp., et al. v. Baler and NVR Settlement Services, Inc.

3.     **Rebecca S. Hannaway.** Ms. Hannaway serves as the Director of Systems and Operations for Paragon. Her address is 2821 Chase Dr., Ft Collins, CO 80525. Ms. Hannaway has over 20 years management experience in the telecommunications, cable and internet industries. Areas of expertise include systems development, network operations, risk management and legal/regulatory compliance. Ms. Hannaway is trained as a Total Quality Management (TQM) facilitator, leading operational teams through process analysis and reengineering to reduce costs and improve efficiency. Most recently, Ms. Hannaway was

**App. 262**

Director of Legal Demands for Comcast, where she managed internal investigations, the processing of subpoenas, network interceptions, E911 emergency support, and Digital Millennium Copyright Act (DMCA) violations. Prior to her work at Comcast, while working at U.S. West, she also had similar responsibilities, which included handling Public Utility Commission (PUC) complaints. Ms. Hannaway has been recognized as a leader in cable internet security matters and has been an industry speaker at the National Cable Television Association, Communications Fraud Control Association and FBI TICTU seminars. Ms. Hannaway currently holds a Top Secret clearance under the Foreign Intelligence Surveillance Act, and has received several commendations for her work with the Department of Justice.

4. **John G. Vondras, P.E.**

a. Mr. Vondras has served as a Consultant for Paragon since February 2007. His address is 12133 East Gold Dust Avenue, Scottsdale, AZ. Mr. Vondras holds a Bachelor of Science degree in Mechanical Engineering and a Master of Science degree in Industrial Engineering from the University of Nebraska. Mr. Vondras is a registered professional engineer in Nebraska and Minnesota. He has over 36 years of experience in the telecommunications and cable industry, and is known for his ability to evaluate and improve operations in a variety of complex environments. His experience includes M&A activities in Europe and Asia, finance, engineering, customer service, regulatory, public policy and human resources in the telecommunications field. Mr. Vondras has served as interim managing director for Belize Telephone Ltd., and provided management oversight

**App. 263**

for cable companies in the French Antilles and eastern France. Mr. Vondras served as President Director and CEO at a U.S. WEST joint venture in Indonesia, managing a 15 year Build Operate and Transfer arrangement from its inception. He was previously acting General Auditor for US WEST.

b.    Mr. Vondras previously testified as an expert witness in Belize Telecom/ICC v. Government of Belize.

5.    Paragon will be compensated at the rate of $250/hour for its expert services in connection herewith.

## II.    Information Considered.

6.    The experts' opinions are based on their professional experience in the telecommunications industry, industry-specific research, as well as court documents and other materials specific to this action, including:

a.    The Amended Class Action Complaint for Violations of Federal Securities Laws (the "Complaint") on file in this matter.

b.    The Fifth Circuit's order dated May 16, 2007, vacating and remanding the United States District Court for the Northern District of Texas' order certifying this securities fraud class action.

c.    The deposition transcript(s) of Royce Holland, Anthony Parella, Timothy Naramore, Denise Crain, Terri Smith, Clay Myers, Christine Kornegay, Jon Marc Baird, and accompanying exhibits marked number 1 through 267.

d.    FCC form 477 Reporting Requirements and Deployment Data as found at www.fcc.gov, FCC Form 477 documentation filed by Allegiance (Attached as

**App. 264**

**Exhibit A** hereto), Securities and Exchange Commission Release #50098 (Attached as **Exhibit B** hereto), dated July 27, 2004, Securities and Exchange Commission Release #2064, dated July 27, 2004, South Carolina Docket 2003-326-C, Superseding Indictment No. S1 4:03CR 00434-CEJ, Sub rebuttal testimony of Dr. Mark T. Bryant (page 16), U.S. District Court, Eastern District of Missouri, Arthur Andersen Internal Memoranda, bates-numbered AA00023 and AA03954.

e.    Additional documents as indicated herein and attached to this report as Exhibits A through G.

f.    We were also orally provided with a description of documents reviewed by plaintiffs' attorneys at the law offices of Brown Rudnick in New York, which documents were only produced to plaintiffs in late October.    Due to time constraints, we have been unable to personally review these documents prior to the filing of this Expert Report, but intend to do so before deposition.

**III.    Summary of Experts' Opinions.**

7.    Allegiance was a competitive local exchange carrier ("CLEC"), and as such, was subject to line count reporting requirements contained in Federal Communications Commission ("FCC") Form 477, governing Local Telephone Competition and Broadband Reporting, as well as procedures propounded by the FCC to ensure accuracy of such required reporting.

8.    FCC Form 477 sets forth an objective standard by which line count shall be measured.    The form requires that line count include only connections that are

5

**App. 265**

"in service," or *revenue-generating* lines actually provided to end users. Form 477 requires that such "in service" lines are measured objectively in terms of voice grade equivalent ("VGE") units. The VGE is also the measure for line count used across the telecommunications industry.

9.    Allegiance, like all CLECs subject to Form 477 reporting requirements, was responsible for ensuring that its line count was accurate. Thus, Allegiance was obligated to verify that the lines it counted and reported were "in service" – that is, active lines actually in use by end users and billed for by Allegiance. In order to comply with the FCC requirement and industry standard that only "in service" lines are counted, local exchange carriers ("LECs") generally generate line count from the company's billing system.

10.    Up until February 19, 2002, at the earliest, (when it announced a global change in its line count methodology) Allegiance did not follow FCC requirements and industry standards for reporting line count. In fact, Allegiance generated its line count from its Confirmed Order Entry ("COE") system, a system which Allegiance knew or should have known would generate an inflated (too high) line count. A line count generated from an orders entry system – particularly Allegiance's COE, which did not operate at a "TN" level, or telephone number level, as discussed below – is likely to include lines and services that were merely "ordered" but never placed "in service," and thus were never actually "lines" for purposes of Form 477 line count reporting. This deficiency was confirmed when Allegiance announced on February 19, 2002, that

**App. 266**

it was reducing its reported line count by some 1 25,000 lines as a result of its historical use of the inaccurate COE system for line count.

11.     Indeed, A llegiance l acked n ecessary i nternal c ontrols t o e nsure a ccurate line count, and, in fact, employed various business practices which seemed to serve no purpose other than the deliberate (and false) inflation of its line count. Among other examples detailed herein, Allegiance inflated its line count by: (i) improperly counting lines before they were "in service," (ii) unreasonably delaying line disconnects (whether voluntary or involuntary for non-payment), (iii) counting non-revenue-generating corporate lines, and (iv) failing to timely reconcile the actual activation of resale lines for end-users.

12.     A company's line count was, during the time relevant to this lawsuit and is today, a key metric considered by financial institutions and the market for determining the value of a local exchange carrier such as Allegiance.  While total line count is necessary to establish a carrier's market share on a line basis, line count growth (in conjunction with "churn," *i.e.* the loss of lines) is the major metric to evaluate a carrier's momentum and future potential. Given the fact that, until February 19, 2002, Allegiance was reporting artificially high line count metrics, its stock was inflated as a result.   Conversely, when Allegiance took down its line count, and reversed these key metrics, its stock dropped.

13.     In failing to assure accurate line count as required by the FCC and by industry standards, Allegiance filed incorrect and misleading 477 Forms with the FCC, and disseminated that incorrect and misleading information to the investing public.

**App. 267**

IV.     **Discussion and Analysis.**

14.     **Allegiance was subject to FCC Form 477 Reporting Requirements,
Which Set Forth an Objective Standard for Determining Line Count**. This
section is analyzed, prepared and reported by Mr. Fanciulli:

a.     In March of 2000, the FCC adopted a semi-annual reporting requirement
(FCC Form 477) to determine the extent of local telecommunications
competition, as fostered by the Telecommunications Act of 1996.[1]     As a
Competitive Local Exchange Carrier ("CLEC"), Allegiance was required to file
the Form 477, certified as to accuracy by an officer of the CLEC. Allegiance
filed Form 477s semi-annually beginning in 2000 through 2003. (*See* **Exhibit A**
hereto, filed Form 477 Certifications).   Clay Myers signed FCC Form 477
Certification Statements on behalf of Allegiance on February 27, 2001; April 6,
2001 and February 28, 2002 (*id.* at Tel.0006, 0008, 0012).   Anthony Parella also
signed FCC Form 477 Certification Statements on behalf of Allegiance on August
31, 2001; August 30, 2002; February 28, 2003 and August 29, 2003 (*id.* at
Tel.0010, 0014, 0016, 0018).

b.     For purposes of this case, the significance of Form 477 is that it clearly
sets forth an objective standard for determining and reporting line count to the
FCC and the public at large.   Thus, a CLEC has only one line count: the accurate
one, using the proper objective standards. A review of certain deposition
testimony in this case, however, revealed a supposed lack of familiarity with, or a
general disregard for, the requirements of Form 477 on the part of Allegiance's

---

[1]  Form 477 is available at www.fcc.gov.

**App. 268**

employees, as well as an untenable company position that its reported line count was somewhat arbitrary and not determined by industry or government standards.

c.    **Objective standards propounded by the FCC are used to measure line count under Form 477.**  Under FCC Form 477, voice telephone service[2] lines are counted in *voice-grade equivalents* **("VGE").  Each VGE constitutes one line.** Virtually any telephone product or service can be represented as a discrete number of lines by converting the product or service into VGEs according to FCC and industry standards. Form 477 sets forth the VGE conversions for most products and services offered by a CLEC, for example:

i.   A traditional analog telephone line is one (1) VGE.

ii.  A Centrex-CO extension is one (1) VGE.

iii. A Centrex-CU trunk is one (1) VGE.

iv.  A BRI (Basic Rate Integrated Services Digital Network) line provisioned as 2B+D is two (2) VGE.

v.   A T-1/DS1 circuit provisioned as 8 local trunks is 8 VGE.

vi.  A fully channelized T-1/DS1 circuit is 24 VGE.

vii. A fully channelized PRI (Primary Rate Integrated Services Digital Network) line over which an ISP's *dial-up* customers connect to the

---

[2] For Form 477, "voice telephone service" means local exchange or exchange access services that allow end users to make local telephone calls on the public switched network, whether used by the end user for voice telephone calls or for other types of calls carried over the public switched network (for example, fax transmissions and dial-up connections to the Internet).

9

Internet (i.e., via a personal computer, a *local-area* telephone number that the ISP uses as an access number, and a standard modem connection) is 23 VGE.

viii. A T-1/DS1 circuit provisioned as 8 voice channels and one broadband connection to the Internet, with any of the unused voice channels to be dynamically allocated for Internet use, is 8 VGE for purposes of Part II of the form. Note that, in this example, the end user also has one (1) broadband connection with an information transfer rate that is greater than 200 kbps and less than 2.5 mbps. (The amount of capacity available for Internet use is at least 16 of the potential 24 voice-grade channels, or about 1.0 mbps.) If the carrier that provides these services to the end user owns the T-1/DS1 circuit, rather than leasing it from an unaffiliated entity, then it also should report one (1) broadband connection in Part I.A of the form (in response to item I-3) because it is the facilities-based provider of that broadband connection.

d.    **Resold lines should be included in line count *only* when they are *actually provided* to paying end-user customers.**    Form 477 provides that resellers of voice telephone service lines are required to report the number of resold lines which they provide to their own end-user customers.   All LECs must report the extent to which they rely on resale lines to serve their own end-user customers.

10

**App. 270**

e.    **Corporate lines should not be included in line count.**   Lines that are used in a corporate or other private, defined-use network should *not* be reported on Form 477.   Corporate lines – those used by Allegiance itself and which generate no revenue to the company – may appear on order, billing and provisioning records so the lines can be readily identified or modified.   These lines are recorded and clearly identified in internal records as being corporate lines.  They should not be included in line count as set forth in the Instructions for Form 477: "Do **n**ot report . . . company official lines."  Nevertheless, Marked Exhibit 103, attached as **Exhibit C** hereto, suggests that these lines were included in Allegiance's reported line count.

f.    The information available to us regarding the over-statement of line count by Allegiance is reminiscent of over-statement of subscriber base by Charter Communications.   The Securities and Exchange Commission's ("SEC")'s statements regarding the effect on the market by over-statements of subscriber base by Charter Communications, while specific to the cable industry, is also relevant to Allegiance's over-statement of line count.   The SEC explained: "Subscriber numbers are . . . used to rank cable companies and used to predict future cash flow, revenue and company growth. . . .: Charter published its subscriber numbers and subscriber growth rate in press releases and reported these figures in quarterly and annual reports filed with the Commission.  Further, investment analysts routinely focused on subscriber numbers in their reports and conference calls, among other factors, to make their recommendations and value a

11

cable company's stock." SEC Release #50098, dated July 27, 2004, III, Summary, 2. Attached as **Exhibit B** hereto.

15.    **Allegiance Artificially Inflated Line Count Through A Number Of Inappropriate Practices.** This section is analyzed, prepared and reported by Ms. Hannaway:

a.      **Allegiance artificially inflated line count by measuring this key metric from its Consolidated Order Entry ("COE") system, rather than counting only lines which are "in service" and billed-for, as required by the FCC and industry standards.** Because Allegiance's COE system included orders for lines regardless of installation status, Allegiance inflated its line count by counting lines for which service may have been delayed, counting the same line twice, and counting line orders which were cancelled or otherwise never ultimately resulted "in service" to a customer. Thus, Allegiance inflated its line count by counting all orders (regardless of the outcome), rather than the actual active service lines.

> i.    Based on a review of depositions and exhibits, it appears that all service orders received by Allegiance were entered into its COE system. Testimony and company press releases suggest that until line count was reduced on February 19, 2002, the COE system was the database used to generate line count at Allegiance.

> ii.   Orders could be new, "ported" (taken from another carrier), or simply expansions of existing services. As orders flowed through the various processes, orders could be cancelled or delayed for a variety of reasons, including: customer change or cancellation; credit

**App. 272**

screening criteria; facility limitations; errors in data entry or delays in transactions with incumbent providers. Small and large business orders – the majority of the orders taken by Allegiance – c an take several weeks to process, and often encounter delays.

iii. Because of the changes and delays listed above, a significant number of the lines o rdered in the C OE sy stem n ever actually r esult i n a n installed line (or line equivalent). This could – and apparently did at Allegiance – result in over-counting of lines when using a COE system as the basis for line count.

iv. Because billing typically does not begin until a line is fully provisioned and in service, the industry standard is for LECs to generate line count from the billing system or the network itself. Allegiance, however, used its order system (COE) to generate its line count until it announced on February 19, 2002, that it was changing its practice and using the billing system to generate line count.

v. Beyond the deficiencies of calculating line count from the COE system, however, because Allegiance delayed line disconnects on a global basis within the organization – and systematically continued to bill after disconnects, as discussed more fully below – line count would have been inflated regardless of whether it used its orders system (COE) or its billing system (Network Strategies). For example, and as discussed further below, Allegiance's Network Strategies system apparently billed for lines for an inordinate amount

13

**App. 273**

of time after suspension.   Furthermore, Allegiance apparently also inappropriately billed for lines before installation.

vi. Finally, Allegiance apparently made no attempt to separate out lines in jeopardy of cancellation or disconnection ("jeps lines") from line count, which also would have further inflated Allegiance's line count.

b.    **Allegiance artificially inflated line count by inordinately delaying its customer disconnects (both voluntary and involuntary).  The failure to timely process disconnects inflated line count in all of Allegiance's systems (COE, billing, etc.).**

i. Voluntary line disconnects in the phone industry are typically processed as soon as possible after receipt of customer's request, and typically should take no longer than 30 days to result in a full termination of service.  Yet, it appears from Marked Exhibit 210, at Algx-Fin 00610-611, attached as **Exhibit D** hereto, that Allegiance chronically delayed disconnects – in both its orders system (COE) and its billing system (Network Strategies) – long after the original disconnection request.

ii. In the event of a "port" (transfer to another carrier), however, it is possible that it might take longer than 30 days to "port" the line to the new carrier (and disconnect at the current carrier) if there are facilities limitations.  However, a "port-back" should not take an exceptional amount of time to disconnect, especially in light of the

14

apparent availability of electronic data interface (automatic information sharing) between the ILEC and Allegiance. Because Allegiance failed to monitor the number of "port-backs" and timely disconnect such lines from both its orders and billing systems, Allegiance further overstated line count.

c.    **Allegiance artificially inflated line count by delaying disconnects due to customer non-payment, and by including "suspended" lines in line count for an inordinate period of time after suspension.**  Allegiance improperly included i n i ts r eported l ine c ount l ines w hich h ad a lready b een d isconnected.[3] Such lines clearly should *not* be included in line count because they are not "in service" as required by the FCC and industry standards. Allegiance, however, not only continued to include such lines in its line count through the COE system, it continued to bill for them through its billing Network Strategies system. *See* Marked Exhibit 210, at Algx-Fin 00610-611, attached as **Exhibit D** hereto. Allegiance also continued to systematically count "suspended" lines in its COE system (and thus in its reported line count) for an inordinate length of time without disconnecting the delinquent lines and removing them from line count.

i. Based on credit standings and account payment histories, an LEC typically examines payment due, days delinquent, or a combination of both, to determine customer suspension or disconnect thresholds for delinquent or "non-pay customers." Customer services are

---

[3] *See* **Exhibit E** hereto, Marked Exhibit 174, e-mail from Joe D'Amico to Anthony Parella dated 3/9/01, explaining "I'm a little concerned with the number of customers we think are on our service that have already disconnected."

**App. 275**

usually "soft-disconnected" – *i.e.* suspended – when a customer fails to bring the account current following written notification. The suspension of an account usually occurs within 60-90 days after billing if the billing is not resolved in a timely manner.

ii. If the customer fails to bring the billing current within 30 days following the suspension, the industry standard is that the account is terminated and a full disconnect order is issued.   It appears that Allegiance, however, kept suspended accounts on its systems (both the order COE system and billing, and thus, included in its line count), for inordinate periods of time after suspension, without disconnecting the delinquent lines.

iii. Disconnected account balances over 90-120 days are often submitted to collection agencies or written off as bad debt.   In some instances, the customer may remain active when the account is delinquent; this typically happens only if the subscriber has entered a payment plan or agreement with the company for payment of the outstanding bill. Breaking the agreement or failing to make the required payments can result in final disconnection.

d.     **In opting for a manual system to process line orders and disconnects, while lacking necessary internal controls to monitor these processes and ensure accurate line count, Allegiance was able to further inflate line count.** It appears that Allegiance employed a manual process in its COE system for processing service orders and disconnections.   By apparently opting for a manual

16

process to process for disconnect orders, the opportunity for Allegiance to over-state its line count was high.    Specifically, manual processing requires considerable monitoring to track the initial sale, order initiation, billing setup, provisioning, cut dates, order completion or cancellations, as well as communication among the CLEC, its internal departments, and customers.

e.    **Allegiance artificially inflated line count by including "resale" lines which were not actively in service to an Allegiance customer end-user.** "Resale" lines are lines provided by other LECs, which Allegiance would then "re-sell" to an end user customer of its own.    Industry practice requires that such resale lines be cross-referenced with records of the ILEC from which the line is acquired, to discern the "in service" status of the line.    Allegiance, however, apparently failed to do so, and, thus, often included resale lines in its line count before they were actually in use by an end-user, thus inflating its line count.

f.    **Allegiance failed to routinely reconcile lines defined on the resale lists (provided to Allegiance, usually in CD form, by the phone companies whose services Allegiance was reselling), lines actively residing in the switch, lines listed in the billing and provisioning systems, and lines sitting in the order system – such routine reconciliation would have greatly reduced the potential for discrepancies.**

g.    Marked Exhibit 165, attached as **Exhibit F** hereto, contains the following information:

> *(PROJECT)      Resale      Reconciliation      (DESCRIPTION)*
> *Reconciliation of resale lines between NS and the LEC.    Create*

*automated process so reconciliation can automatically be performed each month. (STATUS) Texas is complete and results have been handed over to bill production group to be worked. Working o n M O. A meritech a nd B ell S outh m arkets a re o n h old pending receipt of necessary data from LEC.*

Thus, it is clear that in early 2001 Allegiance recognized the need for an automated system that would reconcile Allegiance's resale line records with those of the ILEC (competitor phone company) which was providing the actual services to Allegiance's customers. The lack of such a system invariably led to errors. In the deposition of Royce Holland (Allegiance's CEO), at pp. 98-101, he indicates 30,000 resale lines were removed from Allegiance's line count because of faulty reconciliation between data systems.

h.      **Because Allegiance's COE system apparently could not accurately track the "TN" (telephone number) status – that is, "in service" status – of orders, line count generated from the COE system was further distorted.** In Marked Exhibit 45, attached as **Exhibit G** hereto, in an e-mail from Dana Crowne to Anthony Parella dated March 26, 2001, Crowne indicates that the order system (COE) could not accurately track the "TN" (telephone number) status of the orders in its system. Typically in the industry, the customer telephone number should be able to be tied back to a billing and switch record as well as all work orders registered for the account.

16.     **Metrics Used by Investment Community to Measure the Success of a CLEC**, as analyzed, prepared and reported by Mr. Vondras:

18

a.    Lines (lines in service) are the basic element that allows a communications company to earn revenues.  They are the basis for obtaining any value added, access and other revenues.  Without line growth, a communications company will not expand its business.

b.    During Mr. Vondras' tenure as CEO in Indonesia, he would have semi-annual meetings with the company's lenders.  At each meeting the focus was on lines – how many did you build, how many did you sell, and how many did you install?  The same is true in the cable industry where a potential restructure was evaluated.  Financial institutions requested customer (primarily residential) growth and projections for cable companies, to assure financial commitments could be met.  While in Indonesia, the number of revenue producing lines was a key driver of the business.

17.    **Relationship of "Lines In Service" to Revenue Expectations**, as analyzed, prepared and reported by Mr. Vondras:

a.    In the context of Mr. Vondras's work as a CEO of a joint-venture company with U.S. West in Indonesia, financial institutions were particularly concerned about the number of lines the company had in service.  Line growth is a key metric used by analysts to determine the momentum of any telecommunications company.

b.    In a telecommunications company, lines in service are the main driver of revenues.  This is because the basis for all other revenues (local, value added, access, long distance, etc.) is the basic line.  The lines provide direct access to each customer who then generates revenue for the operator by using the various

19

App. 275 - D

services provided over that line. Thus if continued growth of lines is being reported by a company, the natural conclusion to an investor would be that revenue and subsequently EBITDA would also grow. If lines are significantly adjusted downward as was the case for Allegiance's in the 4th quarter of 2001, the natural reaction would be a negative one. In addition, since line counts increased significantly every quarter in 2001 (save the last), the market reaction was always positive. Therefore it is not surprising that when the line counts were adjusted downward, a negative reaction resulted.

18.    **Relationship of a "Lines In Service" Restatement to Revenue Expectations of a CLEC**, as analyzed, prepared and reported by Mr. Vondras:

a.    One of the reasons the FCC requires the filing of line counts is to show that incumbent telephone companies (ILECs) had opened their networks to others (CLECs). The success of the CLECs can be measured by their line count, line growth and line loss as a percentage of the total ("churn"). These are key metrics to the FCC to determine if competition is working and they are key metrics to anyone who is trying to determine how one telecom company is doing and what its value is. Therefore, when there is a material restatement of line count (125,000 in the context of Allegiance's restatement in February 2002 is material in my view), the whole story for a particular telecom company comes into question.

b.    The restatement of 30,000 resale lines (Holland deposition at 39) and the inconsistency of reporting line counts also questions the accuracy of Allegiance's reporting methods. In addition, on page 26 of Mr. Holland's rebuttal, he says there were no standards for reporting lines. This is not so. The 1996

20

App. 275 - E

communications act caused competition in the local market.   To monitor the progress of competition, the FCC implemented Form 477 for reporting key metrics.


Dated this 1st day of November, 2007          _____
                                              Joseph A. Fanciulli


Dated this 1st day of November, 2007          _____
                                              Rebecca S. Hannaway


Dated this 1st day of November, 2007          _____
                                              John G. Vondras

21

**App. 275 - F**

communications act caused competition in the local market.   To monitor the progress of competition, the FCC implemented Form 477 for reporting key metrics.


Dated this 1st day of November, 2007        _____

Joseph A. Fanciulli

Dated this 1st day of November, 2007        _____

Rebecca S. Hannaway

Dated this 1st day of November, 2007        _____

John G. Vondras

communications act caused competition in the local market. To monitor the
progress of competition, the FCC implemented Form 477 for reporting key
metrics.


Dated this 1st day of November, 2007        _____

                                                 Joseph A. Fanciulli


Dated this 1st day of November, 2007        _____

                                                 Rebecca S. Hannaway


Dated this 1st day of November, 2007        _____

                                                 John G. Vondras

# Exhibit A

COPY

**allegiancetelecom,inc.**
1150 Connecticut Avenue N.W.
Suite 205
Washington, DC 20036
202/296-7727 phone
202/296-9583 fax

May 15, 2000

Magalie Roman Salas
Secretary
Federal Communications Commission
445 12th St. SW
Washington DC 20554

RECEIVED

MAY 15 2000

FEDERAL COMMUNICATIONS COMMISSION
OFFICE OF THE SECRETARY

Attn:  Industry Analysis Division
Room 6-A220
Federal Communications Commission
445 12th St. SW
Washington DC 20554

Re:    Local Competition and Broadband
        Reporting Form
        FCC Form 477

Dear Ms. Salas:

Allegiance Telecom, Inc. ("Allegiance"), hereby submits its completed FCC Forms 477, as well as the required certification for its operating subsidiaries.  Allegiance requests confidential treatment of some of the information reported, because this information is competitively sensitive.  Consequently, Allegiance  is submitting two diskettes as part of this filing. The first diskette contains non-redacted files for the following entities:

Allegiance Telecom of New York, Inc.
Allegiance Telecom of California, Inc.
Allegiance Telecom of Illinois, Inc.
Allegiance Telecom of Georgia, Inc.
Allegiance Telecom of Texas, Inc.

The second diskette contains the redacted files of the completed Forms 477 for the above entities.  A copy of the certification and transmittal letter is being mailed simultaneously to the FCC's contract copier, International Transcription Services.

Please contact ▉▉▉▉▉▉, the contact person listed in the enclosed Form 477, directly if there are any questions concerning the enclosed.

Respectfully submitted,

ALLEGIANCE TELECOM, INC.

By: _Robert E. Kelly_

Robert E. Kelly
Regulatory Manager

cc:    M. Albert
        R. McCausland

V.    CERTIFICATION STATEMENT

FCC Form 477 Local Competition and Broadband Reporting
Transmittal Letter and Certification Statement

Mail to         Industry Analysis Division
                Rm. 6-A220
                445 12th St, SW
                Washington, D.C.  20554

This filing is an    (check one)   ✓ original filing _____ revised filing
Organization name as it appears in all file names: *Allegiance Telecom, Inc.*
Number of files provided for this reporting period:  *10*
Year: *1999*    Data as of: [Check one:  June 30 ___ ;  December 31 ✓ ]

I certify that I am an officer of *Allegiance Telecom, Inc.*; that I have examined the
information contained in the data files either attached herein or transmitted electronically and that to
the best of my knowledge, information and belief, all statements of fact contained in such files are true
and that said files represent an accurate statement of the affairs of the above named respondent as of
the following date: *12/31/99*

If I have requested non-disclosure of some or all of the information in FCC Form 477 by so indicating
on Line 9 of the form, I certify that this information is privileged and confidential and that public
disclosure of such information would likely cause substantial harm to the competitive position of the
respondent.

PRINTED NAME: *Robert W. McCausland*

POSITION: *Vice President*

SIGNATURE: *Robt W. McCausland*

DATE: *5-12-00*

Persons making willful false statements in the report form can be punished by fine or imprisonment
under the Communications Act, 47 U.S.C. 220(e).

CONTACT PERSON: ███████████████
TELEPHONE NUMBER: ███████████████

FEDERAL COMMUNICATIONS COMMISSION

12

*allegiancetelecom, inc.*

*1950 Stemmons Frwy.*
*Suite 3026*
*Dallas, Texas 75207*
*214/853-7100 phone*
*214/853-7110 fax*
*www.allegiancetele.com*

September 6, 2000

Industry Analysis Division
Room 6-A220
Federal Communications Commission
445 12th St. SW
Washington DC 20554

> Re:    Local Competition and Broadband Reporting Form
>        FCC Form 477

To Whom it May Concern:

Allegiance Telecom, Inc. ("Allegiance"), hereby submits its Local Competition and Broadband Reporting Form on FCC Form 477, as well as the required certification. Allegiance has requested non-disclosure of some of the information reported, since Allegiance believes this information is privileged and confidential. Consequently, Allegiance is submitting two diskettes as part of this filing. The first diskette contains the completed original files for the following entities:

> Allegiance Telecom of California, Inc.
> Allegiance Telecom of Georgia, Inc.
> Allegiance Telecom of Illinois, Inc.
> Allegiance Telecom of New York, Inc.
> Allegiance Telecom of Pennsylvania, Inc.
> Allegiance Telecom of Texas, Inc.

Allegiance is also submitting a second diskette which contains the redacted files of the completed Form 477 for the above entities. A copy of the certification and transmittal letter is being mailed simultaneously to the FCC's contract copier, International Transcription Services.

Please contact the contact person listed in the enclosed Form 477 directly if there are any questions concerning the enclosed.

Respectfully submitted,

David L. Starr
Sr. Manager – Regulatory Compliance
Allegiance Telecom, Inc.

## V.    CERTIFICATION STATEMENT

**FCC Form 477 Local Competition and Broadband Reporting**
**Transmittal Letter and Certification Statement**

Mail to          Industry Analysis Division
                 Rm. 6-A220
                 445 12th St, SW
                 Washington, D.C. 20554

This filing is an    (check one)  ✓ original filing        ___revised filing
Organization name: Allegiance Telecom, Inc.
Number of files provided for this reporting period:  12
Year (of the data): 2000      Data as of: [Check one: June 30 ✓;    December 31 ___ ]

I certify that I am an officer of Allegiance Telecom, Inc.; that I have examined the
information contained in the data files either attached herein or transmitted electronically and that to the
best of my knowledge, information and belief, all statements of fact contained in such files are true and
that said files represent an accurate statement of the affairs of the above named respondent as of the
following date: 6/30/00

If I have requested non-disclosure of some or all of the information in FCC Form 477 by so indicating
on Line 10 of the form, I certify that this information is privileged and confidential and that public
disclosure of such information would likely cause substantial harm to the competitive position of the
respondent.

PRINTED NAME: Robert W. McCausland

POSITION: Vice President - Regulatory and Interconnection

SIGNATURE: Rpw. McCausln

DATE: September 5, 2000

Persons making willful false statements in the report form can be punished by fine or imprisonment
under the Communications Act, 47 U.S.C. 220(e).

CONTACT PERSON: ███████████████
TELEPHONE NUMBER: ███████████████

FEDERAL COMMUNICATIONS COMMISSION

12

Tel. 0004
**App. 280**



*allegiancetelecom, inc.*

*1950 Stemmons Frwy.*
*Suite 3026*
*Dallas, Texas 75207*
*214/853-7100 phone*
*214/853-7110 fax*
*www.allegiancetele.com*

February 27, 2001

<u>VIA Overnight Delivery</u>

Industry Analysis Division, Rm. 6-A220
445 12th St., S.W.
Washington, D.C. 20554

Subject:    AllegianceTelecom, Inc.
            Local Competition and Broadband Reporting Form, FCC Form 477

Dear FCC:

AllegianceTelecom, Inc. hereby submits the Local Competition and Broadband Reporting
Form, FCC Form 477, as of December 31, 2000. This filing includes an originally signed
Certification Statement and 20 files contained on 4 floppy diskettes. Of these 20 files, 10
are public versions with the remaining 10 files being privileged and/or confidential
versions of FCC Form 477.

We request **"CONFIDENTIAL"** treatment of the enclosed information.

Please acknowledge receipt of this filing by date stamping the extra copy of this letter and
returning it to me in the enclosed self-addressed envelope.

Please contact me at 469-259-2067 if you have any questions or need additional
information. Thank you.

Sincerely,

David Rose
Regulatory Manager
Allegiance Telecom, Inc.
david.rose@algx.com

Enclosures

## V.    CERTIFICATION STATEMENT

**FCC Form 477 Local Competition and Broadband Reporting**
**CERTIFICATION STATEMENT**

Mail to          Industry Analysis Division
                 Rm. 6-A220
                 445 12th St, SW
                 Washington, D.C. 20554

This filing is an    (check one)  _X_ original filing          _ revised filing

Organization name:  ____Allegiance Telecom, Inc._____.

Number of files provided for this reporting period:  __ 20 files (4 disks)__.

Year (of the data): __2000___        Data as of:  [Check one:  June 30___ ;   December 31 _X_ ]

I certify that I am an officer of ___Allegiance Telecom, Inc._____; that I have examined the information contained in the data files attached herein and that to the best of my knowledge, information and belief, all statements of fact contained in such files are true and that said files represent an accurate statement of the affairs of the above named respondent as of the following date: ___December 31, 2000_____.

If I have requested non-disclosure of some or all of the information in FCC Form 477 by so indicating on Line 10 of the form, I certify that this information is privileged and confidential and that public disclosure of such information would likely cause substantial harm to the competitive position of the respondent.

PRINTED NAME: _G. Clay Myers_____

POSITION: _SVP - Finance_____

SIGNATURE: _____

DATE: ___2/27/2001_____

Persons making willful false statements in the report form can be punished by fine or imprisonment under the Communications Act, 47 U.S.C. 220(e).

CONTACT PERSON: _████████████████

TELEPHONE NUMBER: ___████████████

12

*allegiancetelecom, inc.*
9201 Central Expressway
Dallas, TX 75231
469/259-2890 phone
469/259-9120 fax

April 6, 2001

<u>VIA Overnight Delivery</u>

Industry Analysis Division, Rm. 6-A220
445 12th St., S.W.
Washington, D.C. 20554

Subject:     AllegianceTelecom, Inc.
             Local Competition and Broadband Reporting Form, FCC Form 477

Dear FCC:

AllegianceTelecom, Inc. hereby submits revisions to the Local Competition and
Broadband Reporting Form, FCC Form 477, as of December 31, 2000. This revised
filing includes an originally signed Certification Statement and 20 files contained on 4
floppy diskettes. Of these 20 files, 10 are public versions with the remaining 10 files
being privileged and/or confidential versions of FCC Form 477.

We request **"CONFIDENTIAL"** treatment of the enclosed information.

Please acknowledge receipt of this filing by date stamping the extra copy of this letter and
returning it to me in the enclosed self-addressed envelope.

Please contact ██████████████ if you have any questions or need additional
information. Thank you.

Sincerely,

David Rose
Regulatory Manager
Allegiance Telecom, Inc.
<u>david.rose@algx.com</u>

Enclosures

## V.    CERTIFICATION STATEMENT

**FCC Form 477 Local Competition and Broadband Reporting**
**CERTIFICATION STATEMENT**

Mail to          Industry Analysis Division
                 Rm. 6-A220
                 445 12th St, SW
                 Washington, D.C.  20554

This filing is an    (check one) ___original filing       _X_revised filing
Organization name: _____Allegiance Telecom, Inc._____,
Number of files provided for this reporting period: ___20 files (4 disks)___ ,
Year (of the data): __2000___          Data as of: [Check one:  June 30___ ;    December 31 _X_ ]

I certify that I am an officer of ___Allegiance Telecom, Inc._____ ; that I have examined the information
contained in the data files attached herein and that to the best of my knowledge, information and belief, all
statements of fact contained in such files are true and that said files represent an accurate statement of the affairs
of the above named respondent as of the following date: ____December 31, 2000_____ .

If I have requested non-disclosure of some or all of the information in FCC Form 477 by so indicating on Line 10
of the form, I certify that this information is privileged and confidential and that public disclosure of such
information would likely cause substantial harm to the competitive position of the respondent.


PRINTED NAME: _____Clay Myers_____

POSITION: _____ Sr. V.P. Accounting____

SIGNATURE: _____

DATE: _____04/06/01_____

Persons making willful false statements in the report form can be punished by fine or imprisonment under the
Communications Act, 47 U.S.C. 220(e).

CONTACT PERSON: _____██████████████████
TELEPHONE NUMBER: _____████████████

12

Tel. 0008
**App. 284**



9201 N. Central Expressway
The Pyramids, Bldg. B
Dallas, TX 75231
214/261-7100 phone
469/259-9122 fax

August 31, 2001

<u>VIA Overnight Delivery</u>

FCC
Industry Analysis Division, Rm. 6-A220
445 12th St., S.W.
Washington,  D.C.  20554

Subject:    Allegiance Telecom, Inc.
            FCC Form 477 - Local Competition and Broadband Reporting

Dear FCC:

Allegiance Telecom, Inc. hereby submits the Local Competition and Broadband
Reporting Form, FCC Form 477, as of June 30, 2001.  This filing includes an originally
signed Certification Statement and 32 files contained on 8 floppy diskettes.  Of these 32
files, 16 are public versions with the remaining 16 files being privileged and/or
confidential versions of FCC Form 477.

We request **"CONFIDENTIAL"** treatment of the enclosed information.

Please acknowledge receipt of this filing by date stamping the extra copy of this letter and
returning it to me in the enclosed self-addressed envelope.

Please contact ▮▮▮▮▮▮▮▮▮▮ if you have any questions or need additional
information.  Thank you.

Sincerely,

David Rose
Regulatory Manager
Allegiance Telecom, Inc.
(469) 259-2067
david.rose@algx.com

Enclosures

Tel. 0009

**App. 285**

Instructions for the Local Competition and Broadband Reporting Form, FCC Form 477 (For Filing Due 9/1/01)

## V.    CERTIFICATION STATEMENT

---

**FCC Form 477 Local Competition and Broadband Reporting**

**CERTIFICATION STATEMENT**

Mail to          Industry Analysis Division
                 Rm. 6-A220
                 445 12th St, SW
                 Washington, D.C.  20554

This filing is an    (check one)  _X_ original filing        ___revised filing

Organization name:__ Allegiance Telecom, Inc. _____.

Number of files provided for this reporting period: __ 32 (16 Redacted and 16 Complete) ___

Year (of the data): __ 2001 ____   Data as of:  [Check one: June 30 _X_ ;   December 31 ___ ]

I certify that I am an officer of __ Allegiance Telecom, Inc. _____; that I have examined the
information contained in the data files attached herein and that to the best of my knowledge,
information and belief, all statements of fact contained in such files are true and that said files
represent an accurate statement of the affairs of the above named respondent as of the following date:
___ June 30, 2001 _____.

If I have requested non-disclosure of some or all of the information in FCC Form 477 by so indicating
on Line 10 of the form, I certify that this information is privileged and confidential and that public
disclosure of such information would likely cause substantial harm to the competitive position of the
respondent.

PRINTED NAME: __Anthony Parella_____

POSITION: ___Executive Vice President_____

SIGNATURE:

DATE: ___August 31, 2001_____

Persons making willful false statements in the report form can be punished by fine or imprisonment
under the Communications Act, 47 U.S.C. 220(e).

CONTACT PERSON: ____███████████████████

TELEPHONE NUMBER: ____███████████████

---

FEDERAL COMMUNICATIONS COMMISSION

Tel. 0010
App. 286

*allegiancetelecom,inc.*
9201 N. Central Expressway
Suite 6B
Dallas, TX 75231
214/261-7100 phone

Case 03-cv-04670 JK     Document 103-7     Filed 11/01/2007     Page 42 of 97

RECEIVED & INSPECTED

MAR 1 - 2002

FCC - MAILROOM

February 28, 2002

VIA Overnight Delivery

FCC Form 477
(Attn: CCB/IAD, Room 6-A220)
Federal Communications Commission
9300 East Hampton Drive
Capitol Heights, MD 20743

Subject:     Allegiance Telecom, Inc.
             Local Competition and Broadband Reporting Form, FCC Form 477

Dear FCC:

Allegiance Telecom, Inc. hereby submits its Local Competition and Broadband Reporting Forms, FCC Form 477, as of December 31, 2001. This filing includes an originally signed Certification Statement and 36 files contained on 18 floppy diskettes. Of these 36 files, 18 are public versions with the remaining 18 files being privileged and/or confidential versions of FCC Form 477.

We request **"CONFIDENTIAL"** treatment of the enclosed information.

Please acknowledge receipt of this filing by date stamping the extra copy of this letter and returning it to me in the enclosed self-addressed envelope.

Please contact ▮▮▮▮▮▮▮▮▮▮ if you have any questions or need additional information. Thank you.

Sincerely,

David Rose
Manager, Regulatory Compliance
Allegiance Telecom, Inc.
david.rose@algx.com

Enclosures

Instructions for the Local Competition and Broadband Reporting Form, FCC Form 477 (For Filing Due 3/1/02)

## V.    CERTIFICATION STATEMENT

```
RECEIVED & INSPECTED

MAR 1 – 2002

FCC - MAILROOM
```

FCC Form 477 Local Competition and Broadband Reporting
CERTIFICATION STATEMENT

Check the method (use ONLY one) used to deliver completed Form 477(s) to the FCC. See
Instructions, Section IV, for the proper address to use for each delivery method:

___ E-mail        X  Overnight service other than United States Postal Service
___ Messenger or hand delivery   ___ Other (specify: _____)

Also see Instructions, Section IV, for separate directions on how to submit the signed, original paper
copy of this Certification Statement to the FCC.


This filing is an   (check one)  X original filing     ___revised filing
Organization name:   Allegiance Telecom, Inc.
Number of files provided for this reporting period:   36
Year (of the data):  2001        Data as of: [Check one: June 30___;   December 31 X ]

I certify that I am an officer of   Allegiance Telecom, Inc.        ; that I have examined the
information contained in the data files attached herein and that to the best of my knowledge, information
and belief, all statements of fact contained in such files are true and that said files represent an accurate
statement of the affairs of the above named respondent as of the following date:
    December 31, 2001


If I have requested non-disclosure of some or all of the information in FCC Form 477 by so indicating
on Line 10 of the form, I certify that this information is privileged and confidential and that public
disclosure of such information would likely cause substantial harm to the competitive position of the
respondent.

PRINTED NAME:   Clay Myers


POSITION:   Sr. Vice President - Finance

SIGNATURE: _____


DATE:   February 28, 2002
Persons making willful false statements in the report form can be punished by fine or imprisonment
under the Communications Act, 47 U.S.C. 220(e).

CONTACT PERSON: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
TELEPHONE NUMBER: ▇▇▇▇▇▇▇▇▇▇

FEDERAL COMMUNICATIONS COMMISSION

Tel. 0012
App. 288

INSPECTED

9201 N. Central Expressway
The Pyramids, Bldg. B
Dallas, TX 75231
214/261-7100 phone
469/259-9122 fax

RECEIVED & INSPECTED

SEP 3 ~ 2002

FCC - MAILROOM

August 30, 2002

**VIA Overnight Delivery**

FCC Form 477
(Attn: WCB/IATD, Room 6-A220)
Federal Communications Commission
9300 East Hampton Drive
Capitol Heights, MD 20743

Subject:     Allegiance Telecom, Inc.
             Local Competition and Broadband Reporting Form, FCC Form 477

Dear FCC:

Allegiance Telecom, Inc. hereby submits its Local Competition and Broadband Reporting Forms, FCC Form 477, as of June 30, 2002. This filing includes an originally signed Certification Statement and 32 files contained on 8 floppy diskettes. Of these 32 files, 16 are public versions with the remaining 16 files being privileged and/or confidential versions of FCC Form 477.

We request **"CONFIDENTIAL"** treatment of the enclosed complete versions.

Please acknowledge receipt of this filing by date stamping the extra copy of this letter and returning it to me in the enclosed self-addressed envelope.

Please contact ████████████████ if you have any questions or need additional information. Thank you.

Sincerely,

David Rose
Manager, Regulatory Compliance
Allegiance Telecom, Inc.
david.rose@algx.com

Enclosures

Instructions for the Local Competition and Broadband Reporting Form, FCC Form 477 (For Filing Due 9/1/02)

## V.    CERTIFICATION STATEMENT

**FCC Form 477 Local Competition and Broadband Reporting  (ATTENTION: WCB/IATD, Room 6-A220)**

**CERTIFICATION STATEMENT**

Check the method (use ONLY one) used to deliver completed Form 477(s) to the FCC.  See Instructions, Section IV, for the proper address to use for each delivery method:

____ E-mail                          X  Overnight service other than United States Postal Service

____ Messenger or hand delivery   ____ Other (specify: _____)

Also see Instructions, Section IV, for separate directions on how to submit the signed, original paper copy of this Certification Statement to the FCC.

This filing is an    (check one)  _X_original filing          ____revised filing

Organization name:  ____Allegiance Telecom, Inc._____

Number of files provided for this reporting period:  __32 files on 8 floppy disks__

Year (of the data): __2002____        Data as of: [Check one:  June 30_X_ ;   December 31 ____ ]

I certify that I am an officer of ____Allegiance Telecom, Inc._____ ;  that I have examined the information contained in the data files attached herein and that to the best of my knowledge, information and belief, all statements of fact contained in such files are true and that said files represent an accurate statement of the affairs of the above named respondent as of the following date:
     __August 29, 2002_____

If I have requested non-disclosure of some or all of the information in FCC Form 477 by so indicating on Line 10 of the Cover Page of the form, I certify that this information is privileged and confidential and that public disclosure of such information would likely cause substantial harm to the competitive position of the respondent.

PRINTED NAME:  __Anthony Parella_____

POSITION:  __President, Telecom and Retail Services____

SIGNATURE:  _____

DATE:  ____August 29, 2002_____

Persons making willful false statements in the report form can be punished by fine or imprisonment under the Communications Act, 47 U.S.C. 220(e).

CONTACT PERSON:  _____████████████████████

TELEPHONE NUMBER:  ____████████_____

FEDERAL COMMUNICATIONS COMMISSION

13

Tel. 0014

**App. 290**





*allegiancetelecom.inc.*
9201 N. Central Expressway
The Pyramids, Bldg. B
Dallas, TX 75231
214/261-7100 phone
469/259-9122 fax

February 28, 2003

<u>VIA Overnight Delivery</u>

FCC Form 477
(Attn: WCB/IATD, Room 6-A220)
Federal Communications Commission
9300 East Hampton Drive
Capitol Heights, MD 20743

Subject:     Allegiance Telecom, Inc.
             Local Competition and Broadband Reporting Form, FCC Form 477

Dear FCC:

Allegiance Telecom, Inc. hereby submits its Local Competition and Broadband Reporting Forms, FCC Form 477, as of December 31, 2002. This filing includes an originally signed Certification Statement and 36 files contained on 10 floppy diskettes. Of these 36 files, 18 are public versions with the remaining 18 files being privileged and/or confidential versions of FCC Form 477.

We request **"CONFIDENTIAL"** treatment of the enclosed complete versions.

Please acknowledge receipt of this filing by date stamping the extra copy of this letter and returning it to me in the enclosed self-addressed envelope.

Please contact ███████████████ if you have any questions or need additional information. Thank you.

Sincerely,

David L. Starr
Director, Regulatory Compliance
Allegiance Telecom, Inc.
david.starr@algx.com

Enclosures

Tel. 0015

**App. 291**

Instructions for the Local Competition and Broadband Reporting Form, FCC Form 477 (For Filing Due 3/1/03)

## V.    CERTIFICATION STATEMENT

**FCC Form 477 Local Competition and Broadband Reporting (ATTENTION: WCB/IATD, Room 6-A220)**

**CERTIFICATION STATEMENT**

RECEIVED & INSPECTED

MAR 3 2003

FCC - MAILROOM

Check the method (use ONLY one) used to deliver completed Form 477(s) to the FCC. See Instructions, Section IV, for the proper address to use for each delivery method:

___ E-mail        ✓ Overnight service other than United States Postal Service
___ Messenger or hand delivery   ___ Other (specify: _____ )

Also see Instructions, Section IV, for separate directions on how to submit the signed, original paper copy of this Certification Statement to the FCC.

This filing is an   (check one) ✓ original filing      ___ revised filing
Organization name:  _Allegiance Telecom, Inc._
Number of files provided for this reporting period:  _36_
Year (of the data): _2002_       Data as of: [Check one: June 30___;   December 31 ✓ ]

I certify that I am an officer of _Allegiance Telecom, Inc._ ; that I have examined the information contained in the data files submitted and that to the best of my knowledge, information and belief, all statements of fact contained in such files are true and that said files represent an accurate statement of the affairs of the above named respondent as of the following date:
_Dec. 31, 2002_

If I have requested non-disclosure of some or all of the information in FCC Form 477 by so indicating on Line 10 of the Cover Page of the form, I certify that this information is privileged and confidential and that public disclosure of such information would likely cause substantial harm to the competitive position of the respondent.

PRINTED NAME:  _Anthony J. Parella_

POSITION: _President of Retail Services_

SIGNATURE: _Andy J Parell_

DATE: _Feb. 28, 2003_

Persons making willful false statements in the report form can be punished by fine or imprisonment under the Communications Act, 47 U.S.C. 220(e).

CONTACT PERSON:  ███████████
TELEPHONE: ███████████      E-MAIL ██████████████

FEDERAL COMMUNICATIONS COMMISSION

14

*allegiancetelecom,inc.*

**Legal Department**
9201 Central Expressway
Dallas, TX 75231

RECEIVED & INSPECTED

2003 SEP -2  A II: 50

FCC-MAILROOM

August 29, 2003

<u>VIA Overnight Delivery</u>

FCC Form 477
(Attn: WCB/IATD, Room 6-A220)
Federal Communications Commission
9300 East Hampton Drive
Capitol Heights, MD 20743

Subject:    Allegiance Telecom, Inc.
               Local Competition and Broadband Reporting Form, FCC Form 477

Dear FCC:

Allegiance Telecom, Inc. hereby submits its Local Competition and Broadband Reporting
Forms, FCC Form 477, as of June 30, 2003.  This filing includes an originally signed
Certification Statement and 40 files contained on 1 CDROM.  Of these 40 files, 20 are
public versions with the remaining 20 files being privileged and/or confidential versions of
FCC Form 477.

We request **"CONFIDENTIAL"** treatment of the enclosed complete versions.

Please acknowledge receipt of this filing by date stamping the extra copy of this letter and
returning it to me in the enclosed self-addressed envelope.

Please contact ██████████████ if you have any questions or need additional
information.  Thank you.

Sincerely,

David L. Starr
Director, Regulatory Compliance
Allegiance Telecom, Inc.
david.starr@algx.com

Enclosures

Instructions for the Local Competition and Broadband Reporting Form, FCC Form 477 (For Filing Due 9/1/03)

## V.   CERTIFICATION STATEMENT

FCC Form 477 Local Competition and Broadband Reporting (ATTENTION: WCB/IATD, Room 6-A220)

CERTIFICATION STATEMENT

*RECEIVED & INSPECTED*

*2003 SEP -2  A 11: 50*

*FCC-MAILROOM*

Check the method (use ONLY one) used to deliver completed Form 477(s) to the FCC.  See Instructions, Section IV, for the proper address to use for each delivery method:

____ E-mail          ✓ Overnight service other than United States Postal Service

____ Messenger or hand delivery   ____ Other (specify: _____)

Also see Instructions, Section IV, for separate directions on how to submit the signed, original paper copy of this Certification Statement to the FCC.

This filing is an   (check one)  ✓ original filing       ____ revised filing
Organization name:  Allegiance Telecom, Inc.
Number of files provided for this reporting period:  40
Year (of the data):  2003      Data as of: [Check one:  June 30 ✓;   December 31 ____ ]

I certify that I am an officer of  Allegiance Telecom, Inc.; that I have examined the information contained in the data files submitted and that to the best of my knowledge, information and belief, all statements of fact contained in such files are true and that said files represent an accurate statement of the affairs of the above named respondent as of the following date:
June 30, 2003

If I have requested non-disclosure of some or all of the information in FCC Form 477 by so indicating on Line 10 of the Cover Page of the form, I certify that this information is privileged and confidential and that public disclosure of such information would likely cause substantial harm to the competitive position of the respondent.

PRINTED NAME:  ANTHONY J. PARELLA

POSITION:  President of Retail Services

SIGNATURE:  [signature]

DATE:  8/29/03

Persons making willful false statements in the report form can be punished by fine or imprisonment under the Communications Act, 47 U.S.C. 220(e).

CONTACT PERSON:  ██████████

TELEPHONE: ██████████      E-MAIL: ██████████

FEDERAL COMMUNICATIONS COMMISSION

14



Legal Department
9201 Central Expressway
Dallas, TX 75231

March 1, 2004

<u>VIA Overnight Delivery</u>

FCC Form 477
(Attn: WCB/IATD, Room 6-A220)
Federal Communications Commission
9300 East Hampton Drive
Capitol Heights, MD 20743

Subject:    Allegiance Telecom, Inc.
            Local Competition and Broadband Reporting Form, FCC Form 477

Dear FCC:

Allegiance Telecom, Inc. hereby submits its Local Competition and Broadband Reporting Forms, FCC Form 477, as of December 31, 2003. This filing includes an originally signed Certification Statement and 40 files contained on 1 CDROM. Of these 40 files, 20 are public versions with the remaining 20 files being privileged and/or confidential versions of FCC Form 477.

We request **"CONFIDENTIAL"** treatment of the enclosed complete versions.

Please acknowledge receipt of this filing by date stamping the extra copy of this letter and returning it to me in the enclosed self-addressed envelope.

Please contact ▮▮▮▮▮▮▮▮▮▮ if you have any questions or need additional information. Thank you.

Sincerely,

David L. Starr
Director, Regulatory Compliance
Allegiance Telecom, Inc.
david.starr@algx.com

Enclosures

Tel. 0019

**App. 295**

Instructions for the Local Competition and Broadband Reporting Form, FCC Form 477 (For Filing Due 3/1/04)

## V.    CERTIFICATION STATEMENT

---

**FCC Form 477 Local Competition and Broadband Reporting  (ATTENTION:  WCB/IATD, Room 6-A220)**

**CERTIFICATION STATEMENT**

Check the method (use ONLY one) used to deliver completed Form 477(s) to the FCC.  See Instructions, Section IV, for the proper address to use for each delivery method:

____ E-mail            ✓ Overnight service other than United States Postal Service

____ Messenger or hand delivery   ____ Other (specify: _____)

Also see Instructions, Section IV, for separate directions on how to submit the signed, original paper copy of this Certification Statement to the FCC.

This filing is an   (check one)  ✓ original filing      ____ revised filing
Organization name: Allegiance Telecom, Inc,
Number of files provided for this reporting period:  40
Year (of the data): 2003      Data as of:  [Check one:  June 30___;   December 31 ✓ ]

I certify that I am an officer of Allegiance Telecom, Inc. ; that I have examined the information contained in the data files submitted and that to the best of my knowledge, information and belief, all statements of fact contained in such files are true and that said files represent an accurate statement of the affairs of the above named respondent as of the following date:
Dec. 31, 2003

If I have requested non-disclosure of some or all of the information in FCC Form 477 by so indicating on Line 10 of the Cover Page of the form, I certify that this information is privileged and confidential and that public disclosure of such information would likely cause substantial harm to the competitive position of the respondent.

PRINTED NAME: MARK STACHIW

POSITION: SVP - General Counsel - Allegiance Telecom Company Worldwide

SIGNATURE: _____

DATE: 3/1/04
Persons making willful false statements in the report form can be punished by fine or imprisonment under the Communications Act, 47 U.S.C. 220(e).

CONTACT PERSON: ███████████

TELEPHONE: ███████████    E-MAIL: ███████████████

---

FEDERAL COMMUNICATIONS COMMISSION

14

# Exhibit B

Home | Previous Page



U.S. Securities and Exchange Commission

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 50098 / July 27, 2004**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 2064 / July 27, 2004**

**Admin. Proc. File No. 3-11563**

| | |
|---|---|
| In the Matter of<br><br>Charter Communications, Inc.<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934 |

### I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Charter Communications, Inc. ("Charter" or "Respondent").

### II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing a Cease-and-Desist Order Pursuant to Section 21C of the Securities Exchange Act of 1934 ("Order"), as set forth below.

### III.

On the basis of this Order and Respondent's Offer, the Commission finds that:

## Respondent

1. Charter is a Delaware Corporation with its principal executive office located in St. Louis, Missouri. Charter is the third largest cable television operator in the United States serving approximately 6.2 million customers in 37 states. Through its subsidiaries, Charter provides basic cable, digital cable, high speed internet and telephone services to its customers. Charter's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is listed on the NASDAQ National Market.

## Summary

2. From the first through the fourth quarters of 2001, Charter inflated the number of customers who subscribed to its services in an attempt to meet analysts' expectations for subscriber growth and depict itself as a growing company. To inflate its subscriber numbers, Charter employees stopped its usual practice of disconnecting the services of delinquent paying customers and customers who had requested the termination of their services. As a result of this conduct, Charter artificially inflated its number of subscribers and subscriber growth that it reported to the Commission and to the public from the first through the fourth quarters of 2001 in its Forms 8-K, Forms 10-Q and Form 10-K.

3. In the fourth quarter of 2000, Charter also inflated its year-end revenue and operating cash flow by $17 million when it realized its year-end revenue and operating cash flow for 2000 was going to be short of analysts' expectations. To do so, Charter entered into one contract under which it agreed to pay two of its digital set-top box suppliers an additional $20 for each set-top box it purchased and simultaneously entered into another contract under which its set-top box suppliers agreed to purchase $20 in advertising services from Charter for each set-top box Charter purchased. In reality, no real revenue was generated from these transactions because Charter provided the suppliers with the money they used to purchase the advertising services from Charter. Charter overpaid approximately $17 million to the two set-top box suppliers and received the same amount back from the two suppliers as advertising revenue in the fourth quarter of 2000. Consequently, Charter improperly inflated its 2000 year-end revenue and operating cash flow that it reported to the Commission and to the public in its Form 10-K for 2000.

## Charter's Inflation of Subscriber Numbers

4. Subscriber numbers are an important measure used to rank cable companies and used to predict future cash flow, revenue and company growth. Specifically, Charter's rank as the third largest cable company is dependent on its total number of subscribers. Charter published its subscriber numbers and subscriber growth rate in press releases and reported these figures in quarterly and annual reports filed with the Commission. Further, investment analysts routinely focused on subscriber numbers in their reports and conference calls, among other factors, to make their recommendations and value a cable company's stock.

Charter Communications, Inc. - Admin. Proc. Rel. No. 34-50098 / July 27, 2004    Page 3 of 8

Case 3:03-cv-02761-K    Document 163-7    Filed 1/10/1/2007    Page 55 of 97

5. Charter held itself out as an industry leader in subscriber growth. Specifically, in 1999 Charter reported that its basic customer growth of 3.1% exceeded the national average of 1.8%. In 2000, Charter held itself out as an industry leader in subscriber growth by reporting basic subscriber growth of 2.5% for the year. Similarly, in 2001, Charter reported that it continued to pace the industry with customer growth of 1.1%.

6. At the end of each prior year, Charter set its subscriber growth targets for the upcoming year through the company budget process. As part of the budget process, Charter assigned subscriber growth targets to each of its divisions. In turn, the divisions assigned the responsibility of meeting the division's subscriber growth targets to its region and system levels that set subscriber growth targets on a monthly and quarterly basis.

7. Beginning in the first quarter of 2001, Charter began experiencing an increase in the number of customers switching to satellite television service and customers who, at the end of a special price promotion period, either became delinquent in paying their account balances or requested that their service be terminated. As the competition from satellite providers and the number of delinquent paying subscribers increased throughout 2001, some of Charter's regions stopped disconnecting some of its subscribers who Charter would have ordinarily disconnected in order to meet subscriber growth targets. At Charter this process was known as "managing disconnects" or "holding disconnects." By managing or holding disconnects, customers remained in Charter's subscriber count and enabled it to meet subscriber growth targets for the company.

8. Charter had no company-wide policy as to when to disconnect delinquent paying or "non-pay" customers. Some systems at Charter historically disconnected customers when their accounts became 60 to 75 days past due, but during the first through the fourth quarters of 2001 were told not to disconnect these customers in order to inflate subscriber numbers. To this end, Charter allowed accounts for customers' who otherwise would have been disconnected to age well past 60 days to meet subscriber growth targets. Many non-pay customers' accounts were held for more than 90 days and some well over 120 days before being disconnected. By not disconnecting these customers' service, Charter was able to include these customers in its subscriber count.

9. Charter's usual business practice was to disconnect a customer's service within seven to ten days after a customer voluntarily requested termination of their service. To meet subscriber growth targets, however, Charter occasionally ignored this practice by delaying the disconnect of customers' services to beyond seven to ten days. By not timely disconnecting these customers' services, Charter was able to include these customers in its subscriber count.

10. By improperly managing disconnects, Charter was able to tell the public that for the first through fourth quarters of 2001 it was meeting and, at times, exceeding analysts' expectations for subscriber growth when, in fact, Charter actually experienced flat to negative growth for those periods. If, however, Charter employees had followed usual disconnect practices and removed subscribers who should have been disconnected from active subscriber rolls, it would have reported materially lower subscriber totals.

Charter Communications, Inc.: Admin. Proc. Rel. No. 34-50098 / July 27, 2004    Page 4 of 8

Case 3:03-cv-02761-K    Document 103-7    Filed 11/01/2007    Page 56 of 97

11. As a result of managing disconnects, Charter included materially inflated subscriber numbers in its Forms 8-K containing the press releases on its financial results for the first quarter through fourth quarter of 2001, its Forms 10-Q for the first quarter through the third quarters of 2001 and its Form 10-K for 2001. Thus, by inflating subscriber numbers Charter misstated the number of subscribers and subscriber growth figures it reported to the Commission and falsely depicted itself to the public and analysts as a growing company.

### Charter's Inflation of Revenue and Operating Cash Flow

12. In the fourth quarter of 2000, Charter realized that its 2000 year-end revenue and operating cash flow was going to be approximately $17 million short of Charter's budget targets and analysts' expectations. Analysts use these numbers to assess the company's stock value and Charter reports them in its quarterly and annual reports, analyst's conference calls and press releases.

13. To generate additional revenue and operating cash flow in order to overcome the fiscal year 2000 shortfall, Charter devised a scheme to get advertising business from its digital set-top box suppliers. To carry out the scheme, Charter entered into one agreement under which it paid two of its set-top box providers an additional $20 for each set-top box it purchased and simultaneously entered into another agreement under which the two set-top box providers purchased $20 in advertising from Charter for each set-top box Charter purchased. Charter increased its revenue and operating cash flow with the $20 Charter was paid by the suppliers as advertising revenue. In effect, however, no real revenue was generated by these transactions because by paying an additional $20 per set-top box, Charter gave the suppliers the money to purchase the advertising services from Charter.

14. Charter improperly recognized revenue from these transactions because they were barter transactions. According to the principals set forth in SAB 101 and EITF 99-17, revenue cannot be recognized from barter transactions unless there is a determinable fair value. In addition, Charter was advised at the time by its auditor that in order to properly recognize revenue from these transactions and avoid these transactions from being considered barter transactions, the transactions had to be: 1) unrelated to each other; 2) negotiated at least one month apart; and 3) set at fair market value. Instead, Charter negotiated both the set-top box and advertising contracts at the same time in September 2000 and tried to conceal the fact that the contracts were negotiated simultaneously by backdating the set-top box contracts to August 2000. Additionally, the contracts were related given that both contracts were executed to carry out the scheme to raise additional revenue and operating cash flow. Finally, these transactions were not undertaken at the fair value of the time slots purchased because these set-top box suppliers paid four to five times more for their advertisement time slots than other parties had paid Charter for advertisement time slots during 2000.

15. As a result of this scheme, Charter improperly recognized approximately $17 million in advertising revenue and was able to meet analysts' expectations as to revenue and operating cash flow in the fourth quarter of 2000. Consequently, Charter overstated its 2000 year-end

revenue and operating cash flow by approximately $17 million in its Form 10-K for 2000.

### Charter's Violations of the Exchange Act

16. As a result of the conduct described above, Charter violated Section 13 (a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder, which require issuers of securities registered pursuant to Section 12 of the Exchange Act to file accurate reports on Forms 10-K, 10-Q and 8-K. These reports must contain any material information necessary to make statements made in the reports not misleading. No showing of scienter is necessary to establish an issuer's violation of the corporate reporting provisions. See SEC v. McNulty, 137 F.3d 732, 740-41 (2d Cir. 1998). As discussed above, Charter violated these provisions by filing periodic reports that misstated its total number of basic subscribers and subscriber growth numbers for the first through fourth quarters of 2001 in its Forms 8-K containing press releases on its financial results from the first quarter through fourth quarter of 2001, its Forms 10-Q from the first quarter of 2001 through the third quarter of 2001 and its Forms 10-K for 2001. In addition, Charter overstated its operating cash flow and revenue for the year-end 2000 in its Form 10-K for 2000.

17. As a result of the conduct described above, Charter also violated Section 13(b)(2)(A) of the Exchange Act and Rule 13b2-1 thereunder. Section 13(b)(2)(A) requires reporting companies registered under Section 12 of the Exchange Act to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the issuer's assets. In addition, Rule 13b2-1 of the Exchange Act prohibits any person from directly or indirectly falsifying any book, record or account required to be kept pursuant to Section 13(b)(2) (A) of the Exchange Act. Charter misstated the number of subscribers it reported in books, records and accounts for the first through fourth quarters of 2001 and overstated its 2000 year-end operating cash flow and revenue by approximately $17 million by improperly recognizing revenue from its set-top box suppliers. Charter violated Rule 13b2-1 when it falsified its books and records by reporting subscribers in its total subscriber count that should have been disconnected, improperly recognizing revenue and operating cash flow from barter transactions and backdating contracts.

18. Further, as a result of the conduct described above, Charter violated Sections 13(b)(2)(B) and 13(b)(5) of the Exchange Act. Section 13(b)(2) (B) requires reporting companies to devise and maintain a system of internal accounting controls sufficient to reasonably assure that transactions are recorded and financial statements are prepared in conformity with GAAP. Additionally, Section 13(b)(5) of the Exchange Act provides that, among other things, no person shall knowingly circumvent or fail to implement a system of internal accounting controls or falsify any book, record or account described in Section 13(b)(2). Charter had no formal policies or procedures sufficient to assure that systems were not managing or holding disconnects in order to artificially inflate subscriber numbers and that employees had properly accounted for revenue and cash flow from barter transactions. Moreover, Charter violated Section 13(b)(5) by instructing systems not to follow the disconnect procedures they did have and allowing employees to backdate the set-top box contracts with its suppliers.

Charter Communications, Inc. . Admin. Proc. Rel. No. 34-50098 / July 27, 2004    Page 6 of 8

Case 3:03-cv-02761-K   Document 103-7   Filed 11/01/2007   Page 58 of 97

## Undertakings

Respondent undertakes to:

A. Assure that public disclosures made by Charter to its shareholders and Commission are accurate and complete, that such disclosures fairly present Charter's financial condition and results of operations, and that such disclosures are made on a timely basis, as required by applicable laws and regulations.

B. Assure that it reports accurate subscriber numbers and subscriber growth, stops the practice of holding disconnects to meet budget targets and complies with the company's new disconnect policies.

C. Assure that internal controls are in place to prevent recurrences of the improper accounting treatment in the fourth quarter of 2000 resulting in Charter overstating its revenue by $17 million. To this end, Charter will undertake certain actions, including, but not limited to, the following: a) assure that barter transactions are afforded the correct accounting treatment under GAAP; and b) develop a system of accounting oversight to assure that contracts are dated properly.

D. Adopt a zero tolerance policy on holding or managing disconnects in order to inflate subscriber numbers and terminate any employee found to be managing or holding disconnects for this purpose. In addition, Charter's Chief Executive Officer will issue quarterly written reminders to all employees regarding Charter's zero tolerance policy for holding or managing disconnects in order to inflate subscriber numbers.

E. Institute a formal written policy that details disconnect procedures for terminating the service of delinquent paying subscribers. This policy will require that delinquent paying customers' service be terminated 60 to 75 days after their account balance becomes past due ("termination date") and that their balances be written off to bad debt 90 to 110 days after their account balances become past due ("write off date"). Charter may specifically identify a few categories of subscribers that, for historical business reasons, Charter permits to remain as active subscribers for more than 75 days after a bill becomes past due. Any exceptions Charter makes to allow a delinquent paying customer to remain an active subscriber after 75 days of non-payment shall be documented, reviewed and approved by Key Market Area management personnel at or before the close of each billing cycle. Division level management shall also review and approve these documented exceptions to Charter's formal written disconnect policy at or before the close of each billing cycle. In its formal written disconnect policy, Charter shall identify these categories of subscribers and describe for each the reasons for making an exception to its formal written disconnect policy as well as termination dates and write off dates applicable to each exception. Charter may periodically add, subtract or change the categories of customers excepted from its formal written disconnect policy with an appropriate disclosure in its public filings with the Commission. In the cases of any exceptions made to Charter's formal written disconnect policy, Charter may not keep any delinquent paying subscribers on its subscriber rolls for the purpose of increasing reported subscriber numbers.

Charter Communications, Inc.: Admin. Proc. Rel. No. 34-50098 / July 27, 2004    Page 7 of 8

Case 3:03-cv-02761-K    Document 103-7    Filed 11/01/2007    Page 59 of 97

F. Establish a Corporate Director of Credit and Collections who is responsible for monitoring Charter's credits and collections and developing reports that monitor bad debt on a monthly basis. These reports will be distributed to Charter's Chief Operating Officer and to the Legal Department who will investigate and remedy instances when bad debt may be rising and ensure that employees are promptly disconnecting non-paying subscribers.

G. Reform its Corporate Compliance Program by, among other things, establishing a web site and toll-free telephone number managed by an independent third party through which employees can report suspected violations of its accounting procedures and code of ethics. In addition, Charter will establish a Compliance Committee to evaluate suspected violations, conduct investigations and make disciplinary recommendations.

H. Cease considering the achievement of subscriber growth targets as a component of employee bonuses.

I. Replace its top-down budget process with a bottom-up budget process that eliminates industry analysts' projections as a component of setting Charter's budget goals.

J. Include a disclosure in its quarterly and annual filings with the Commission as to the number of active subscribers whose accounts are more than 60 days, 90 days and 120 days past due.

K. Instruct its internal auditors to review compliance with Charter's formal disconnect procedures on a quarterly basis and report the findings to its public auditors in connection with its annual audit.

L. Any undertakings set forth in Section III above which were implemented prior to the date of this Order shall be maintained.

### Remedial Efforts by Charter Communications

19. In determining to accept the Offer, the Commission considered remedial acts promptly undertaken by Respondent and cooperation Respondent afforded the Commission staff.

### IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Charter's Offer.

Accordingly, it is hereby ORDERED:

A. Pursuant to Section 21C of the Exchange Act, that Charter cease and desist from committing or causing any violations and any future violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1 thereunder; and

B. Charter shall comply with the undertakings enumerated in Section III above.

Charter Communications, Inc.; Admin. Proc. Rel. No. 34-50098 / July 27, 2004        Page 8 of 8

Case 3:03-cv-02761-K        Document 103-7        Filed 11/01/2007        Page 60 of 97

By the Commission.

Jonathan G. Katz
Secretary

*http://www.sec.gov/litigation/admin/34-50098.htm*

Home | Previous Page                                        Modified: 07/27/2004

# Exhibit C

**ALLEGIANCE TELECOM**
**LINE ANALYSIS**
**Product Summary**

| | ACT Jan-02 | PLAN Jan-02 | VARIANCE |
|---|---|---|---|
| **Gross Sales** | | | |
| UNE | 30,591 | 34,510 | (3,919) |
| Resale | 3,218 | 2,341 | 877 |
| DSL | - | - | - |
| T1-Voice | 3,305 | 3,860 | (555) |
| Data/Internet | 6,056 | 4,641 | 1,415 |
| Integrated Access | 1,336 | 4,091 | (2,755) |
| Total Communications | 15,668 | 20,397 | (4,529) |
| T1 Based Products | 26,565 | 32,990 | (6,425) |
| Total Retail | 60,374 | 69,841 | (9,467) |
| MMPS/PRI | 337 | 14,568 | (14,231) |
| Hosting: Internet Access | - | - | - |
| Coast to Coast | - | - | - |
| Total | 60,711 | 84,409 | (23,698) |
| **Cancels** | | | |
| UNE | 5,392 | 6,269 | 877 |
| Resale | 399 | 252 | (147) |
| DSL | - | 0 | 0 |
| T1-Voice | 1,871 | 1,060 | (811) |
| Data/Internet | 1,428 | 953 | (475) |
| Integrated Access | 646 | 516 | (130) |
| Total Communications | 3,735 | 3,554 | (181) |
| T1 Based Products | 7,680 | 6,083 | (1,597) |
| Total Retail | 13,471 | 12,604 | (867) |
| MMPS/PRI | 118 | - | (118) |
| Hosting: Internet Access | - | - | - |
| Coast to Coast | - | - | - |
| Total | 13,589 | 12,604 | (985) |
| **Net Sales** | | | |
| UNE | 25,199 | 28,242 | (3,043) |
| Resale | 2,819 | 2,089 | 730 |
| DSL | - | (0) | 0 |
| T1-Voice | 1,434 | 2,800 | (1,366) |
| Data/Internet | 4,628 | 3,688 | 940 |
| Integrated Access | 690 | 3,576 | (2,886) |
| Total Communications | 12,133 | 16,843 | (4,710) |
| T1 Based Products | 18,885 | 26,907 | (8,022) |
| Total Retail | 46,903 | 57,237 | (10,334) |
| MMPS/PRI | 219 | 14,568 | (14,349) |
| Hosting: Internet Access | - | - | - |
| Coast to Coast | - | - | - |
| Total | 47,122 | 71,805 | (24,683) |
| **Beginning Lines** | | | |
| UNE | 391,452 | 422,465 | (31,013) |
| Resale | 69,006 | 68,489 | 517 |
| DSL | 762 | 647 | 115 |
| T1-Voice | 15,248 | 21,327 | (6,079) |
| Data/Internet | 40,347 | 36,740 | 3,607 |
| Integrated Access | 22,473 | 28,506 | (6,033) |
| Total Communications | 50,686 | 55,978 | (5,092) |
| T1 Based Products | 128,954 | 142,551 | (13,597) |
| Total Retail | 580,174 | 624,152 | (43,978) |
| MMPS/PRI | 322,092 | 308,216 | 13,876 |
| Hosting: Internet Access | 60,713 | 60,713 | - |
| Coast to Coast | 21,919 | 21,919 | - |
| Corporate | 30,102 | - | 30,102 |
| Total | 1,015,000 | 1,015,000 | 0 |

Confidential
Algx-Fin 00010

Proprietary and Confidential: Distribution Limited Solely to Board of
Directors and Authorized Employees of Allegiance Telecom, Inc.
Page 6

Kornegay #
103

App. 307

# Exhibit D

# Inputs and Leakage End User Lines



Lines into Billing

Broadwing
LD

**TBS**
Local, UNE, T1, UNE-P

**COE**
Resale

**Customer Care/Cust. Imp**
LSR/ASR from LEC for Port Cut
Silent Port Out
Downsized Businesses

**BIRT**
Billing Dispute Resolution:

**Customer Care/Cust. Imp./Sales**
Moved Off Network

**Executive Escalations**
Trouble Ticket Problems

**Credit and Collections/Billing Production**
Deadbeats, Failed Businesses

Lines Disconnect from Billing

Confidential
Aigx-Fin 00582

Clay Ayers
#210
Kornegay #112



Confidential
Algx-Fin 00583

App. 310



# NS Disconnects by Month in 2002

**Legend:**
- Prior Months Disco's
- Last Month Disco's
- Current Month Disco's

Y-axis: Total NS Line Disco's (0 to 60,000)

X-axis: Jan, Feb, Mar, Apr*

**Jan:** 22,637 — 45%; 15,075 — 30%

**Feb:** 12,545 — 47%; 4,896 — 19%

**Mar:** 9,561 — 43%; 7,521 — 34%

**Apr*:** 8,506 — 36%; 8,188 — 34%

*April data through 4/23/02
Network Strategies Disconnects Only

Confidential
Algx-Fin 00584

**App. 311**



# NS Disconnects by Product in 2002

Confidential
Algx-Fin 00585

App. 312

*April data through 4/24/02
Network Strategies Disconnects Only

# Churn Rate by Product - UNE's



| | Jan | Feb | Mar | Apr* |
|---|---|---|---|---|
| | 9.3% | 3.9% | 3.2% | 4.2% |
| Avg Install Base (Beg/End Balance) | 414,425 | 411,361 | 421,160 | 428,091 |

% Churn

*April data through 4/23/02
Network Strategies Disconnects Only

Confidential
Algx-Fin 00586

**App. 313**



# Churn Rate by Product – IAD/Ded Int

| Avg Install Base (Beg/End Balance) | 114,438 | 131,713 | 150,959 | 164,657 |

*April data through 4/23/02
Network Strategies Disconnects Only

Confidential
Algx-Fin 00587



Churn Rate by Product - Resale

| Avg Install Base (Beg/End Balance) | 57,595 | 54,949 | 52,832 | 51,277 |

*April data through 4/23/02
Network Strategies Disconnects Only

Confidential
Algx-Fin 00588

App. 315



# Churn Rate by Product – Other

| | Jan | Feb | Mar | Apr* |
|---|---|---|---|---|
| | 3.9% | 2.2% | 1.8% | 2.1% |
| Avg Install Base (Beg/End Balance) | 75,089 | 72,729 | 75,187 | 77,543 |

*April data through 4/23/02
Network Strategies Disconnects Only

Confidential
Algx-Fin 00589

App. 316



# Churn Rate by Product - All Products

| | Jan | Feb | Mar | Apr* |
|---|---|---|---|---|
| % Churn | 7.6% | 4.0% | 3.2% | 3.3% |
| Avg Install Base (Beg/End Balance) | 661,546 | 670,752 | 700,137 | 721,568 |

*April data through 4/23/02
Network Strategies Disconnects Only

Confidential
Algx-Fin 00590

App. 317



**Allegiance Telecom**
**Billing Disconnect Forecast**
Processed as of 4/23/02 8:16:02 AM

| Central Office | PSR Number | DD Comp Date | Status | TEL # | RPON | State |
|---|---|---|---|---|---|---|
| WILLIAMSBURG | | | | | | |
| | 1161651 | 4-10-02 6:17:16 PM | A | 7153256663 | PB CHG-DISC'X1 | NY |
| | 1169320 | 4-4-02 3:37:11 PM | A | 7153326560 | PB NY SILENT PB | NY |
| | 1169370 | 4/4/02 3:17:13 PM | A | 7153326661 | PB NY SILENT PB | NY |
| Total Lines for WILLIAMSBURG | | 3 | | | | |
| WILMINGTON | | | | | | |
| | 1157212 | 3/26/02 8:01:19 PM | A | 3102474101 | CA CHG-DISC'X1 | CA |
| | 1157212 | 3/26/02 8:01:19 PM | A | 3102374105 | CA CHG-DISC'X1 | CA |
| | 1157222 | 3/26/02 8:01:19 PM | A | 3103424105 | CA CHG-DISC'X1 | CA |
| Total Lines for WILMINGTON | | 3 | | | | |
| WOODLAND II | | | | | | |
| | 1159746 | 3/26/02 4:51:45 PM | A | 5305608418 | PB CA 5305610418-409 | CA |
| | 1163541 | 3/26/02 5:17:17 PM | A | 5305603349 | PB CA 5305663369-350 | CA |
| | 1163657 | 3/29/02 10:48:39 PM | A | 5305600325 | PB CA5305683929-533 | CA |
| | 1163657 | 3/29/02 10:48:39 PM | A | 5305600326 | PB CA5305692526-535 | CA |
| | 1163541 | 3/26/02 5:17:14 PM | A | 5305603366 | PB CA 5305663066-350 | CA |
| | 1163651 | 3/29/02 10:40:16 PM | A | 5305662505 | PB CA5305662970-535 | CA |
| | 1163651 | 3/29/02 10:40:16 PM | A | 5305602524 | PB CA5305662530-533 | CA |
| Total Lines for WOODLAND II | | 7 | | | | |
| WYANDOTTE | | | | | | |
| | 1129239 | 4/6/02 3:35:36 PM | A | 7345255350 | PB IL WD7345255350 | MI |
| | 1233238 | 4/12/02 3:04:30 PM | A | 7345253333 | MI CHG-DISC'X1J | MI |
| | 1129230 | 4/6/02 3:55:36 PM | A | 7345859429 | PB MI WD73452585015D | MI |
| Total Lines for WYANDOTTE | | 3 | | | | |
| YORK | | | | | | |
| | 1174665 | 4/4/02 3:30:13 PM | A | 4453249101 | MD CHG-DISC'X1J | MD |

| DD Month | PB | Disco | Grand Total |
|---|---|---|---|
| 03/2002 | 360 | 366 | 1120 |
| 04/2002 | 370 | 372 | 1105 |
| Grand Total | 1496 | 738 | 2234 |

Above totals illustrate PB or DISCO lines Active in NS.

*Disc and PB orders with DD task closed and BillingD task still open*

Confidential
Algx-Fin 00591

App. 318

# Portbacks/Disconnects in Progress

Washington D.
Washington DC

| Order # | FOC | Cust Name | Lines | COE Flag | NS Status | Active Tasks |
|---------|-----|-----------|-------|----------|-----------|--------------|

**Grand Totals:**

Total Lines Pending Portback/Disconnect in TBS: 10,652

Total Lines Pending Removal from COE: 10,470

Total Lines Pending Disconnect from Billing: 7,188

Tuesday, April 23, 2002

Confidential
Algx-Fin 00592

App. 319



# Project Tourniquet

# A Two-Phase Approach to Slashing Churn

Confidential
Algx-Fin 00593

App. 320



*allegiancetelecom,inc.*



# Root Cause Analysis

- Review resolution codes for all trouble tickets and billing disputes

- Winback Team root cause data

- Weekly review with Executive Escalations and Bill of Rights Managers

- Focus on process and procedure changes to eliminate the major causes of dissatisfaction with our customers

"Confidential - For Internal Use Only"

## Trouble Ticket Resolutions - MTD April 2002

| Reason Code | Count | % of total |
|---|---|---|
| Activations Not Performed Count | 208 | 2.25% |
| ALGX Count | 85 | 0.92% |
| ALGX COLO Hardware Count | 308 | 3.34% |
| ALGX COLO Software Count | 123 | 1.33% |
| ALGX Inside Plant Count | 80 | 0.87% |
| Blocked / Non Payment Count | 12 | 0.13% |
| Blocked or NonPayment Count | 1 | 0.01% |
| CPE Billable Count | 294 | 3.19% |
| Customer Count | 141 | 1.53% |
| Customer Canceled Ticket Count | 346 | 3.75% |
| Customer Education Count | 305 | 3.31% |
| Customer Premise Equipment Count | 566 | 6.14% |
| Customer Wire / Cable Count | 735 | 7.97% |
| Disconnect In Error Count | 96 | 1.04% |
| Duplicate Ticket Count | 216 | 2.34% |
| IAD Count | 10 | 0.11% |
| IAD Hardware Count | 65 | 0.70% |
| IAD Software Count | 81 | 0.88% |
| ILEC Count | 156 | 1.69% |
| ILEC Cable F1 Count | 532 | 5.77% |
| ILEC Cable F2 Count | 707 | 7.66% |
| ILEC Cable MDF Count | 229 | 2.48% |
| ILEC Hardware Count | 432 | 4.68% |
| ILEC Translations Count | 189 | 2.05% |
| LERG External Count | 9 | 0.10% |
| NetTrans Count | 8 | 0.09% |
| NetTrans Carrier Analyis Count | 5 | 0.05% |
| NetTrans Digit Analysis CDI Count | 5 | 0.05% |
| NetTrans Digit Analysis Other Count | 18 | 0.20% |
| NetTrans Digit Analysis RTI Count | 34 | 0.37% |
| NetTrans Digit Analysis Vacant Count | 39 | 0.42% |
| NetTrans Office Parameter Count | 1 | 0.01% |
| NetTrans Screening Count | 14 | 0.15% |
| NetTrans Signaling Count | 22 | 0.24% |
| NetTrans Trunking Count | 12 | 0.13% |
| No Trouble Found Count | 76 | 0.82% |
| No Trouble Found ALGX Count | 1039 | 11.26% |
| No Trouble Found ILEC Count | 214 | 2.32% |
| NTF Billable Count | 106 | 1.15% |
| Order Issue Count | 325 | 3.52% |
| Please Specify Count | 3 | 0.03% |
| Portback Count | 65 | 0.70% |
| RPOTS / RUVG Card Issue Count | 202 | 2.19% |
| RPOTS or RUVG Card Issue Count | 34 | 0.37% |
| Systems Test Ticket Count | 22 | 0.24% |
| Toll Carrier Count | 27 | 0.29% |
| Toll Carrier ALGX Count | 299 | 3.24% |
| Toll Carrier Non ALGX Count | 183 | 1.98% |
| Translations Not Built Count | 30 | 0.33% |
| Translations Not Built - Feature Count | 342 | 3.71% |
| Translations Not Built - Hunt Group Count | 77 | 0.83% |
| Translations Not Built - Network Count | 67 | 0.73% |
| Wrong Signaling Type Count | 30 | 0.33% |
| Grand Count | 9225 | |

Confidential
Algx-Fin 00595

## BIRT RESOLUTION CODES - APRIL

| Subtype | Resolution Codes | Total Clarity | ARS | Subtype Total | % Subtype | Res Total | % Reason |
|---|---|---|---|---|---|---|---|
| **Billed After Disco - BAD** | | | | | | | |
| | BAD - Order never placed for disco of service | 127 | 1 | | | 128 | 29.84% |
| | BAD - COE order not worked or rejected | 17 | | | | 17 | 3.96% |
| | BAD - Billing task never completed | 57 | | | | 57 | 13.29% |
| | BAD - Translations task never completed | 28 | | 429 | 21.62% | 28 | 6.53% |
| | BAD - Numbers never disco'd in NS | 154 | 1 | | | 155 | 36.13% |
| | BAD - Silent portback | 10 | | | | 10 | 2.33% |
| | BAD - Feature not disco | 34 | | | | 34 | 7.93% |
| **Billed After Cancel - BAC** | | | | | | | |
| | BAC - Cancel never reported cust | 49 | | | | 49 | 44.95% |
| | BAC - Order canceled after billing turn-up | 20 | | 109 | 5.49% | 20 | 18.35% |
| | BAC - Cancel requested but not worked | 40 | | | | 40 | 36.70% |
| **Billed Before Install - BBI** | | | | | | | |
| | BBI - FOC date not updated for sup | 58 | | | | 58 | 50.00% |
| | BBI - IAD/TC Data turned up before voice | 15 | | 116 | 5.85% | 15 | 12.93% |
| | BBI - Billing task closed pre-install | 30 | 2 | | | 32 | 27.59% |
| | BBI - Customer not notified of completed order | 11 | | | | 11 | 9.48% |
| **Double Billed Lines - DBL** | | | | | | | |
| | DBL - System Error | 3 | | 7 | 0.35% | 3 | 42.86% |
| | DBL - Mis-keyed error | 4 | | | | 4 | 57.14% |
| **Double Billed Features - DBF** | | | | | | | |
| | DBF - System Error | 8 | | 14 | 0.71% | 8 | 57.14% |
| | DBF - Mis-keyed error | 6 | | | | 6 | 42.86% |
| **Tax Exempt - TE** | | | | | | | |
| | TE - Incorrectly coded in NS | 57 | | 64 | 3.23% | 57 | 89.06% |
| | TE - Paperwork lost | 7 | | | | 7 | 10.94% |
| **Tax Rate - TR** | | | | | | | |
| | TR - Rate incorrect in system | 13 | | 13 | 0.66% | 13 | 100.00% |
| **Feature Pricing - FP** | | | | | | | |
| | FP - Cust informed that features are free | 28 | | 80 | 4.03% | 28 | 35.00% |
| | FP - Cust not aware of per usage charge | 52 | | | | 52 | 65.00% |
| **Feature Not Req - FNR** | | | | | | | |
| | FNR - Sales order incorrect | 103 | 3 | | | 106 | 33.76% |
| | FNR - NS keying error | 53 | 2 | 314 | 15.83% | 55 | 17.52% |
| | FNR - TBS keying error | 41 | | | | 41 | 13.06% |
| | FNR - Cust not aware of features with LEC | 112 | | | | 112 | 35.67% |
| **LD Min Usage Chge - LDMU** | | | | | | | |
| | LDMU - Cust not aware of charge | 47 | | | | 47 | 43.93% |
| | LDMU - Cust supposed to be on 5.9 promo | 52 | | 107 | 5.39% | 52 | 48.60% |
| | LDMU - Cust education required | 8 | | | | 8 | 7.48% |
| **TN Unknown - TNU** | | | | | | | |
| | TNU - Mis-keyed line(s) | 44 | | | | 44 | 26.19% |
| | TNU - Cust unaware of all TNs | 68 | | 168 | 8.47% | 68 | 40.48% |
| | TNU - Lines ordered w/out informing customer | 49 | | | | 49 | 29.17% |
| | TNU - BAC on individual TNs | 7 | | | | 7 | 4.17% |
| **Line Charge - LC** | | | | | | | |
| | LC - Product type mis-keyed | 23 | | | | 23 | 30.67% |
| | LC - Volume Discount mis-keyed | 10 | | 75 | 3.78% | 10 | 13.33% |
| | LC - Cust unaware of the T-1 incremental line charges | 10 | | | | 10 | 13.33% |
| | LC - Sales quoted different rate | 32 | | | | 32 | 42.67% |
| **Usage** | | | | | | | |
| | USAGE - Miss-keyed wrong rate | 17 | 2 | 45 | 2.27% | 19 | 42.22% |
| | USAGE - Sales quoted different rate | 26 | | | | 26 | 57.78% |
| **Fees** | | | | | | | |
| | FEES - Install Fees (other) | 42 | | | | 42 | 17.87% |
| | FEES - Install Fees ($99, 499, 899) | 20 | | | | 20 | 8.51% |
| | FEES - Account Set Up Fees | 77 | | | | 77 | 32.77% |
| | FEES - Vendor Charges | 16 | 1 | | | 17 | 7.23% |
| | FEES - Service Order Fee | 15 | | 235 | 11.84% | 15 | 6.38% |
| | FEES - Late Fees | 33 | | | | 33 | 14.04% |
| | FEES - Restoral Fees | 13 | | | | 13 | 5.53% |
| | FEES - Reimbursement Install Fees | 4 | | | | 4 | 1.70% |
| | FEES - PIC Change Fees | 14 | | | | 14 | 5.96% |
| **Unknown Local Calls** | | | | | | | |
| | | 21 | | 21 | 1.06% | 21 | 100.00% |
| **Unknown Lata Calls** | | | | | | | |
| | | 19 | | 19 | 0.96% | 19 | 100.00% |
| **Service Downtime** | | | | | | | |
| | | 47 | 7 | 54 | 2.72% | 54 | 100.00% |
| **Sales Goodwill - SG** | | | | | | | |
| | SG - Sales quoted non-standard pricing | 15 | 5 | 20 | 1.01% | 20 | 100.00% |
| **Other** | | | | | | | |
| | Invoice Reprint | 6 | | | | 6 | 6.38% |
| | TC Promo Credit | 5 | | 94 | 4.74% | 5 | 5.32% |
| | Check Request | 83 | | | | 83 | 88.30% |
| | | 1959 | 25 | 1984 | 100.00% | 1984 | |

Confidential
Algx-Fin 00596

**App. 323**

# Winback Root Cause - MTD April

| CASE TYPE | ISSUE | QUANTITY | AVG MTTC | ISSUE PCT% | Weighted MTTC | TYPE MTTC | ISSUE TYPE PCT% |
|---|---|---|---|---|---|---|---|
| BILLING | Billed After Disconnect | 63 | 728.39 | 7.50% | 54.63 | | |
| | Deny Usage | 4 | 70.4 | 0.48% | 0.34 | | |
| | Feature Dispute | 1 | 25.27 | 0.12% | 0.03 | | |
| | Feature Not Requested | 2 | 14.26 | 0.24% | 0.03 | | |
| | Feature Requested Not Active | 2 | 72.55 | 0.24% | 0.17 | | |
| | Install Fees Other | 2 | 624.73 | 0.24% | 1.49 | | |
| | Service Impacting Credit | 6 | 68.55 | 0.71% | 0.49 | | |
| | Waive Set Up Fees | 15 | 21.73 | 1.79% | 0.39 | | |
| | Bill Inquiry | 1 | 0.92 | 0.12% | 0.00 | | |
| | Billed After Cancel | 20 | 825.47 | 2.38% | 19.65 | | |
| | Billed Before Install | 39 | 560.23 | 4.64% | 26.01 | | |
| | Billing Adjustment | 439 | 954 | 52.26% | 498.58 | | |
| | Check Request | 5 | 286.99 | 0.60% | 1.71 | | |
| | Portback Charges | 9 | 677.94 | 1.07% | 7.26 | | |
| | Feature Dispute | 55 | 742.33 | 6.55% | 48.60 | | |
| | LD Min Usage Charge | 5 | 697.85 | 0.60% | 4.15 | | |
| | Line Charge | 25 | 745.46 | 2.98% | 22.19 | | |
| | Please Specify | 19 | 940.82 | 2.26% | 21.28 | | |
| | Pricing | 60 | 783.12 | 7.14% | 55.94 | | |
| | Sales Goodwill | 3 | 58.81 | 0.36% | 0.21 | | |
| | Set Up Fees | 18 | 190.56 | 2.14% | 4.08 | | |
| | Tax Exempt | 4 | 0.05 | 0.48% | 0.00 | | |
| | Tax/Surcharge | 10 | 432.12 | 1.19% | 5.14 | | |
| | TN Unknown to Customer | 26 | 997.1 | 3.10% | 30.86 | | |
| | Early Termination Fees | 2 | 6.31 | 0.24% | 0.02 | | |
| | Slamming | 5 | 12.98 | 0.60% | 0.08 | 803.34 | 20.05% |
| STALL | Acceptance Testing | 10 | 44.34 | 7.63% | 3.38 | | |
| | Broadband | 3 | 1.75 | 2.29% | 0.04 | | |
| | Can't Loop Circuit | 1 | 91.56 | 0.76% | 0.70 | | |
| | Failure During Turnup | 5 | 46.7 | 3.82% | 1.78 | | |
| | Trouble | 23 | 25.23 | 17.56% | 4.43 | | |
| | UNE | 89 | 16.79 | 67.94% | 11.41 | 21.74 | 3.13% |
| INTERNET | Dedicated Connections | 139 | 181.34 | 85.80% | 155.59 | | |
| | Dialup | 4 | 34.64 | 2.47% | 0.86 | | |
| | Domain Email | 6 | 157.94 | 3.70% | 5.85 | | |
| | Domain Only | 5 | 82.87 | 3.09% | 2.56 | | |
| | Email Only | 2 | 375.07 | 1.23% | 4.63 | | |
| | General Questions | 3 | 8.42 | 1.85% | 0.16 | | |
| | Web Hosting Only | 3 | 1171.14 | 1.85% | 21.69 | 191.33 | 3.87% |
| MACD | Add Lines | 68 | 156.25 | 9.81% | 15.33 | | |
| | Bill Split | 4 | 132.92 | 0.58% | 0.77 | | |
| | Billing Address Change | 47 | 116.71 | 6.78% | 7.92 | | |
| | Change Of Ownership | 29 | 162.51 | 4.18% | 6.80 | | |
| | COE | 22 | 66.02 | 3.17% | 2.10 | | |
| | Directory Listing | 56 | 124.18 | 8.08% | 10.03 | | |
| | Disconnect Lines | 50 | 114.73 | 7.22% | 8.28 | | |
| | Feature Change | 276 | 211.6 | 39.83% | 84.27 | | |
| | LIDB Order | 12 | 95.82 | 1.73% | 1.66 | | |
| | Move Order | 6 | 178.55 | 0.87% | 1.55 | | |
| | PIC Request | 122 | 110.04 | 17.60% | 19.37 | | |
| | 800 Number Change | 1 | 69.3 | 0.14% | 0.10 | 158.17 | 16.54% |
| TROUBLE | No Dial Tone | 964 | 35.24 | 40.78% | 14.37 | | |
| | Memory Service | 83 | 29.98 | 3.51% | 1.05 | | |
| | Data Trouble | 32 | 43.91 | 1.35% | 0.59 | | |
| | Can Not Call Out | 490 | 30.34 | 20.73% | 6.29 | | |
| | Can Not Be Called | 490 | 34.82 | 20.73% | 7.22 | | |
| | Can Not Be Heard | 50 | 29.74 | 2.12% | 0.63 | | |
| | Noise Problem | 255 | 35.59 | 10.79% | 3.84 | 33.99 | 56.42% |

Confidential
Algx-Fin 00597

App. 324



allegiancetelecom,inc.
THE NEW WAY TO ORGANIZE TO CONNECT.

"Confidential - For Internal Use Only"

# Defensive Steps



- Winback Team - Customer Care transfers

- Local service line freeze - new contracts

- Sales management involved with collections of all accounts over 1,000 MRR (pre-suspensions)

- Customer Care:  account segmentation

- Bill of Rights Program

Confidential
Algx-Fin 00598
App. 325



*allegiancetelecom,inc.*

"Confidential - For Internal Use Only"



# Defensive Steps – page 2

- New sales compensation plans

- Billing interface

- Billing insert survey cards and website survey

- Written billing dispute cards

- Clarify enhancements for escalations and reporting

Confidential
Algx-Fin 00599

App. 326

*allegiancetelecom, inc.*

## THANK YOU FOR BEING AN ALLEGIANCE TELECOM CUSTOMER.

At Allegiance Telecom, we try to provide the same high quality of service we would want as a valued customer. That is why we developed the Customer Bill of Rights as a means of focusing the attention of our company on each individual customer's needs...one at a time. Please take a moment to tell us how we can help you, or you may e-mail us at CustomerBillofRights@algx.com

Sincerely, Catherine Weekley, Director, Customer Bill of Rights

I would like an Allegiance Telecom Representative to contact me regarding:

(Check one) New Services _____ Phone Trouble _____ Billing _____ Other _____

The best time to reach me is Morning _____ Afternoon _____ Either _____ Phone _____

Account Name _____ Billing Telephone Number _____

Comments _____

_____

(Signature) _____        (Date) _____

COURTESY COMMUNICATIONS COMMITMENT

Confidential
Algx-Fin 00600

App. 327



*allegiancetelecom,inc.*

# THANK YOU FOR BEING AN ALLEGIANCE TELECOM CUSTOMER.

Thank you for your billing inquiry on _____. We have researched your account and determined that your monthly recurring charges for the disputed line/feature(s) will be credited from _____ to _____ and will appear on your next invoice _____. We apologize for any inconvenience you may have experienced. If you have further questions, please call our Customer Care Department at 1-800-553-1989. We appreciate your business!

Customer Service Representative _____

Comments _____

Date _____    Billing Dispute Number _____

Confidential
Algx-Fin 00601

App. 328



# CUSTOMER BILL OF RIGHTS
## QUALITY DASHBOARD

### Customer Care and Internet
23-Apr-02

| 22-Apr-02 | Offered | % Abandoned | Sp. Answered | Handle Time (min) |
|---|---|---|---|---|
| Customer Care | 2730 | 8.60% | 67 | 10.48 |
| NRC | 1639 | 8.60% | 70 | 12.08 |
| Internet | 744 | 2.70% | 70 | 20.40 |
| Billing (included in C. Care) | 1202 | 7.70% | 72 | 11.76 |

| Issue to Save | | | |
| MTD | Attempts | Saves | % saved |
| Total Lines | 4027 | 1164 | 29.00% |

Month To Date

| Offered | % Abandoned | Sp. Answered | Handle Time (min) |
|---|---|---|---|
| 37805 | 7.10% | .59 | 11.33 |
| 24867 | 4.70% | .41 | 14.83 |
| 12321 | 5.50% | .44 | 21.43 |
| 15475 | 6.30% | .73 | unavailable |

| | Prev. MTD | MTD |
| 8459 | 9539 |

### Reasons (by lines)

| | | reason % of Total |
|---|---|---|
| Billing | 694 | 254 | 22% |
| MACD | 739 | 392 | 34% |
| Misc. | 462 | 177 | 15% |
| Winback | 564 | 17 | 1% |
| Trouble | 1568 | 324 | 28% |
| Total | 4027 | 1164 | 100% |

COE
Portbacks

| | 22-Apr |
| Lines Portec Back | 80 |

### Collections
22-Apr-02

| | Offered | % Abandoned | Sp. Answered | Talk Time (min) |
|---|---|---|---|---|
| BRT and Collections ACD | 5,540 | 1.65% | .04 | 4.05 |

### Total Care/Collections
22-Apr-02

| Offered | % Abandon | New Tickets | Closed Tickets |
|---|---|---|---|
| 5540 | 7.70% | 481 | 388 |

Month To Date

| Offered | % Abandoned | Sp. Answered | Talk Time (min) |
|---|---|---|---|
| 7165 | 2.15% | 0:13 | 3:56 |

Month To Date

| Offered | % Abandon | New Tickets |
|---|---|---|
| 76589 | 6.00% | 1978 |

### Open Tickets in Cust Summary
22-Apr-02

| 0-2 days | 3-7 days | 8-15 days | 16-30 days | 31-80 days | 91+ days |
|---|---|---|---|---|---|
| 439 | 1287 | 1620 | 1978 | 4634 | 0 |

| Total | Ave. Age (d) |
|---|---|
| 9962 | 29.16 |

Open Tickets (includes any dups)
Repeats
Chronics
Unavailable
Unavailable

### Trouble Tickets by Group
22-Apr-02

| | 0-23 | 24-47 | 48-71 | 72-95 | 96+ | Total | Ave. Age |
|---|---|---|---|---|---|---|---|
| Field Ops UNE | 110 | 5 | 4 | 17 | 26 | 162 | 30.06 |
| Field Ops Network | 3 | 0 | 0 | 2 | 3 | 6 | 114.76 |
| NRC | 196 | 3 | 5 | 40 | 38 | 282 | 37.97 |
| CIS | 6 | 0 | 0 | 4 | 9 | 19 | 94.66 |
| NOCC | 33 | 0 | 0 | 0 | 2 | 2 | 738.31 |
| BBS/ESG | 3 | 1 | 1 | 7 | 17 | 64 | 139.09 |

| | 0-23 | 24-47 | | 48-95 | 96+ | Total | MTTC |
|---|---|---|---|---|---|---|---|
| Field Ops UNE | 2811 | 1000 | | 690 | 247 | 4748 | 29.34 |
| Field Ops Network | 111 | 32 | | 27 | 19 | 189 | 40.6 |
| CIS | 464 | 115 | | 147 | 83 | 809 | 38.49 |
| NRC | 1266 | 757 | | 525 | 243 | 2791 | 39.5 |
| Misc. | 729 | 215 | | 184 | 145 | 1273 | 34.37 |
| Totals | 5381 | 2119 | | 1573 | 737 | 9810 | 33.86 |
| Repeats | | | | | | 4.47% |
| Chronics | | | | | | 21.18% |

Chronic - same customer, same service location, 3 tickets (same or different) within 30 days
Repeat - same customer, same service location, 2 tickets (same case type and sub-type) within 72 hours

### Network
04/23/2002

| MTD | Outages | Line Impacted | Duration (h) |
|---|---|---|---|
| Co-location summary | 5 | 2964 | 2:26 |
| Simplex Summary (included in Co-lo) | | 0 | 2:04 |
| Data | Unknown | | 6:45 |
| ILEC | 2 | 0 | 1:42 |
| CLEC | 0 | 378 | 0:15 |
| ALGX | 1 | 1580 | |

| Outages | Line Impacted | Duration (h) |
|---|---|---|
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |

Confidential
Algx-Fin 00602

App. 329

## NS DISCONNECTS BY LENGTH IN SERVICE
### (EXCLUDING MMPS)

| | MONTHS IN SERVICE | | | | | | | | | | | | | | TOTAL NS DISCOS | WEIGHTED AVG DURATION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | >12 | | |
| October - 2001 | 395 | 1,246 | 1,213 | 1,771 | 2,044 | 1,562 | 1,485 | 1,730 | 1,446 | 1,569 | 1,257 | 1,020 | 1,547 | 10,365 | 28,650 | 11.49 |
| % of NS Disconnects | 1.38% | 4.35% | 4.23% | 6.18% | 7.13% | 5.45% | 5.18% | 6.04% | 5.05% | 5.48% | 4.39% | 3.56% | 5.40% | 36.18% | | |
| November - 2001 | 342 | 741 | 1,340 | 1,517 | 2,026 | 2,367 | 1,959 | 1,831 | 2,222 | 1,333 | 1,244 | 1,045 | 1,030 | 11,013 | 30,010 | 11.70 |
| % of NS Disconnects | 1.14% | 2.47% | 4.47% | 5.05% | 6.75% | 7.89% | 6.53% | 6.10% | 7.40% | 4.44% | 4.15% | 3.48% | 3.43% | 36.70% | | |
| December - 2001 | 420 | 1,664 | 1,101 | 1,492 | 3,233 | 1,781 | 1,510 | 1,486 | 1,198 | 1,580 | 1,147 | 938 | 966 | 15,040 | 33,496 | 13.21 |
| % of NS Disconnects | 1.25% | 4.97% | 3.29% | 4.45% | 9.65% | 5.32% | 4.51% | 4.44% | 3.58% | 4.72% | 3.42% | 2.80% | 2.70% | 44.90% | | |
| January - 2002 | 248 | 1,262 | 2,361 | 3,535 | 4,104 | 4,332 | 3,349 | 3,225 | 3,267 | 2,677 | 3,160 | 2,801 | 1,444 | 17,980 | 53,745 | 10.98 |
| % of NS Disconnects | 0.46% | 2.35% | 4.39% | 6.58% | 7.64% | 8.06% | 6.23% | 6.00% | 6.08% | 4.98% | 5.88% | 5.21% | 2.69% | 33.45% | | |
| February - 2002 | 750 | 1,077 | 1,543 | 1,442 | 1,595 | 1,421 | 1,576 | 1,698 | 1,647 | 1,403 | 1,300 | 1,677 | 1,182 | 11,799 | 30,100 | 12.03 |
| % of NS Disconnects | 2.49% | 3.58% | 5.13% | 4.79% | 5.27% | 4.72% | 5.24% | 5.64% | 5.47% | 4.66% | 4.32% | 5.57% | 3.93% | 39.20% | | |
| March - 2002 | 869 | 1,777 | 2,104 | 2,768 | 1,842 | 1,962 | 1,452 | 1,236 | 1,117 | 1,068 | 869 | 919 | 924 | 8,869 | 27,776 | 10.17 |
| % of NS Disconnects | 3.13% | 6.40% | 7.57% | 9.97% | 6.63% | 7.06% | 5.23% | 4.45% | 4.02% | 3.85% | 3.13% | 3.31% | 3.33% | 31.93% | | |
| April - 2002 | 410 | 1,446 | 2,245 | 2,251 | 1,840 | 1,774 | 1,570 | 1,191 | 1,163 | 995 | 979 | 1,051 | 992 | 8,678 | 26,585 | 10.63 |
| % of NS Disconnects | 1.54% | 5.44% | 8.44% | 8.47% | 6.92% | 6.67% | 5.91% | 4.48% | 4.37% | 3.74% | 3.68% | 3.95% | 3.73% | 32.64% | | |

| | MONTHS IN SERVICE | | | | | |
|---|---|---|---|---|---|---|
| | 0-3 | 4-6 | 7-9 | 10-12 | >12 | TOTAL |
| October - 2001 | 4,625 | 5,091 | 4,745 | 3,824 | 10,365 | 28,650 |
| % of NS Disconnects | 16.14% | 17.77% | 16.56% | 13.35% | 36.18% | |
| November - 2001 | 3,940 | 6,352 | 5,386 | 3,319 | 11,013 | 30,010 |
| % of NS Disconnects | 13.13% | 21.17% | 17.95% | 11.06% | 36.70% | |
| December - 2001 | 4,677 | 5,524 | 4,264 | 2,991 | 15,040 | 33,496 |
| % of NS Disconnects | 13.96% | 19.48% | 12.73% | 8.93% | 44.90% | |
| January - 2002 | 7,406 | 11,785 | 9,169 | 7,405 | 17,980 | 53,745 |
| % of NS Disconnects | 13.78% | 21.93% | 17.06% | 13.78% | 33.45% | |
| February - 2002 | 4,812 | 4,582 | 4,748 | 4,159 | 11,799 | 30,100 |
| % of NS Disconnects | 15.99% | 15.22% | 15.77% | 13.82% | 39.20% | |
| March - 2002 | 7,518 | 5,256 | 3,421 | 2,712 | 8,869 | 27,776 |
| % of NS Disconnects | 27.07% | 18.92% | 12.32% | 9.76% | 31.93% | |
| April - 2002 | 6,352 | 5,184 | 3,349 | 3,022 | 8,678 | 26,585 |
| % of NS Disconnects | 23.89% | 19.50% | 12.60% | 11.37% | 32.64% | |

** Length in Service = Using the Order Date, Length in Service is the Number of Months between the Install Completion Date and the Disco Completion Date.

Confidential
Algx-Fin 00603
App. 330



APR 2002
NS DISCONNECTS BY MONTHS IN SERVICE
(EXCLUDING MMPS)

Confidential
Algx-Fin 00604

App. 331



APRIL NS DISCONNECTS
AVG MONTHS IN SERVICE BY PRODUCT TYPE

Confidential
Aigx-Fin 00605

App. 332



MAR 2002
NS DISCONNECTS BY MONTHS IN SERVICE
(EXCLUDING MMPS)

Confidential
Algx-Fin 00606

App. 333



MARCH NS DISCONNECTS
AVG MONTHS IN SERVICE BY PRODUCT TYPE

Confidential
Algx-Fin 00607

App. 334



FEB 2002
NS DISCONNECTS BY MONTHS IN SERVICE
(EXCLUDING MMPS)

Confidential
Algx-Fin 00608

App. 335



JAN 2002
NS DISCONNECTS BY MONTHS IN SERVICE
(EXCLUDING MMPS)

LINES

MONTHS IN SERVICE

Confidential
Algx-Fin 00609

App. 336



DEC 2001
NS DISCONNECTS BY MONTHS IN SERVICE
(EXCLUDING MMPS)

Confidential
Algx-Fin 00610
App. 337



Confidential
Algx-Fin 00611
App. 338



Confidential
Aigx-Fin 00612
App. 339

8

Confidential
Algx-Fin 00613

# Exhibit E

**Parella, Tony**

| | |
|---|---|
| From: | D'Amico, Joe |
| Sent: | Friday, March 09, 2001 1:44 PM |
| To: | Parella, Tony |
| Subject: | FW: Resell to Facilities - call results |

Tony here is an update on project silvermine,making a little headway with appts. I'm a little concerned with the number of customers we think are on our sevice that have already disconnected.Will continue to update.............

-----Original Message-----
From: Nichols, Scott
Sent: Friday, March 09, 2001 1:36 PM
To: D'Amico, Joe; Nichols, Scott
Subject: Resell to Facilities - call results

Joe
Here are the numbers:

Number of calls made - 202

1. Number of appointments set - 16
2. Not interested, with no problems - 31
3. Not interested, with problems - 14
4. Already back to SWB - 33
5. Left message/need to call back next week - 108

Notes
 - Several went back to SWB because of billing problems, no help from Customer Care.
 - The "not interested, with problems" typically had some service issues, but more billing issues
 - The "not interested, with no problems" were already happy with ADSL or didn't need anything beyond dial-up access, or corp office had them set up.
 - Over half we could not get in touch with, so we will do another round of calls to those customers next week.  Another report will follow.

Thanks!
Scott

TP 0000775

Tom Lord
# 174

App. 342