# EXHIBIT A

EXPERT REPORT OF CARLYN R. TAYLOR, FTI
CONSULTING, INC.

**FTI CONSULTING, INC.**

*Oscar Private Equity Investments, et al.*

*Plaintiffs,*

*v.*

*Royce J. Holland and Anthony Parella*

*Defendants*

In the United States District Court

For the Northern District of Texas

Dallas Division

Civil Action No. 3:03-CV-2761-H

**DECLARATION OF CARLYN R. TAYLOR, CPA, ABV, MA**

**Submitted on behalf of the Defendants**

2

## A  QUALIFICATIONS

1. I am a Senior Managing Director for FTI Consulting, Inc. ("FTI") and CEO of FTI Capital Advisors ("FTICA") a division of FTI. I am the leader of the Telecommunications Industry practice group for FTI. Prior to my employment with FTI, I was a partner in PricewaterhouseCoopers ("PwC"), where I served as the Telecom Industry Leader for the Financial Advisory Services division of PwC. In September of 2002, FTI acquired the financial consulting and restructuring business from PwC, including 49 PwC partners and approximately 350 professional staff, and our telecom industry practice came to FTI.

2. My educational background consists of B.S. and M.A. degrees in economics from the University of Southern California ("USC"), where I graduated as the University's valedictorian. I have investment banking licenses Series 7, 63, and 24 from the National Association of Securities Dealers; I am a Certified Public Accountant with an Accredited in Business Valuation (ABV) credential from the AICPA; and I am a Certified Insolvency and Restructuring Advisor (CIRA). I attach hereto as Appendix A, a copy of my curriculum vitae, which also lists articles I have published.

3. In my capacity as the Telecom Industry Leader at both FTI and PwC, I have worked on over 300 engagements involving telecom companies, including at least 60 involving CLECs. One of the services my practice provides is restructuring advisory services, and from 1998 through 2005 I led over 85 engagements involving the financial restructuring of telecom companies, of which at least 20 were CLECS. I represented over a dozen bank syndicates in the CLEC sector during the period from 2000 through 2005, including the bank syndicate for the secured lenders of Allegiance Telecom, Inc. ("Allegiance"). I led the engagement representing the Allegiance lenders from approximately July 2002 through the bankruptcy sale to XO Communications, out of which time the lenders were paid in full including all accrued interest. In addition to the telecom restructuring engagements, I have led investment banking and financial consulting engagements involving telecom companies, including M&A advisory, due diligence of business plans for buyers or financial investors, valuation, financial assessments of products and services, statistical analysis of telecom pricing, strategic advisory work, and testifying as an expert witness in commercial and bankruptcy litigations involving the telecom industry.

4. FTI is being compensated for the preparation of this Declaration at standard current rates per professional per hour ranging from $235 to $695 per hour, depending on staff level. FTI's compensation in this matter is not dependent on the results of this report or the outcome of the proceeding.

## B  SCOPE OF ASSIGNMENT AND INFORMATION REVIEWED

1. I have been retained by the law firm Thompson & Knight LLP and have been asked to address the following topics:

     i.      Provide an overview of the Telecommunications industry during the relevant time frame;

ii.   Describe the market dynamics for Competitive Local Exchange Carriers ("CLEC") during the relevant time period;

iii.   Analyze and describe the Allegiance 2/19/2002 press release and any related analyst and market reactions;

iv.   Describe typical analyst valuation metrics as it relates to Allegiance;

v.   Comment on common practices and challenges for calculating line count, including an assessment of the Plaintiff's Expert Report (the "Paragon report").

2. During the course of work on this matter I, or FTI professional staff working under my direction, have reviewed information, including but not limited to documents produced by the Plaintiffs and Defendants; deposition transcripts; Plaintiff expert reports; publicly available information such as industry analyst reports; articles and public securities filings; and information already in my possession pertaining to the telecommunications industry. Attached to this Declaration is a full list of documents that were made available to FTI for review in this matter and/or were obtained by FTI through independent research.

3. The information and conclusions in this report are based on discovery and materials made available to me in sufficient time to review by the date of this report. If my staff and I receive and review additional material relevant to this report, I reserve the right to revise, supplement, or supersede my opinions in a future report. I have been provided enough information for me to be able to formulate my conclusions expressed herein.

## C  SUMMARY OF OPINIONS

1. Based upon the materials I have received in this case to date, and upon the analysis that I have performed, I have reached the following conclusions, all of which are described in the body of this Declaration:

i.   Since the Telecom Act of 1996, the telecommunications industry in general and the CLEC[1] sector specifically experienced rapid growth in the number of competitors and available capacity, resulting in a highly competitive environment which led to unprecedented failure as indicated by the number of companies filing for bankruptcy.

ii.   Many CLEC bankruptcies preceded Allegiance and shook the confidence of the syndicated bank market for CLECs.

iii.   As a result, analysts' reaction to the Allegiance February 19, 2002 press release was primarily focused on financial performance and concerns over the decreasing cushion on bank revenue covenants.

_____

[1] Competitive Local Exchange Carrier.

iv.    The overwhelming majority of analysts covering Allegiance utilized standard valuation methods including Discounted Cash Flow and multiples of revenue or EBITDA[2] - not operating metrics such as line count or churn.

v.    CLEC back office systems are complex and it was not uncommon for growing CLECs to require certain manual processes and reconciliations between functional components of their back office IT systems or experience time delays to accurately order, provision, bill, or remove line information from any given system.

vi.    There is no industry standard for publicly reporting line counts, and line counting methodology varied across different CLECs.  The FCC form 477 was never intended to standardize line counting for public reporting but rather for FCC specific purposes.

## D  INDUSTRY OVERVIEW

1.  The telecommunications industry has changed dramatically over the last two decades, beginning with the break-up of AT&T that separated the long distance entity from the local exchange portion of the business.  On January 1, 1984, the divestiture of the AT&T monopoly was implemented.  AT&T was broken up into a new AT&T and seven Regional Bell Operating Companies (RBOCs).  The new AT&T was to provide long distance services and equipment manufacture and sales, and the seven RBOCs were to provide local telephone service.  The break-up of AT&T was the first significant step toward the evolution of the competitive landscape as it exists today.[3]

2.  As a direct result of the AT&T divestiture, a competitive long distance market began to emerge that included numerous facilities-based providers (such as MCI and Sprint), and an increasing number of resellers and wholesale providers.  Initially, AT&T faced retail price competition from facilities-based competitors, such as MCI (which had been in the market since 1972) and Sprint (which had become a facilities-based long distance provider a few years before the divestiture).  These new competitors were given pricing flexibility by the Federal Communications Commission ("FCC") that AT&T did not have, because AT&T was considered the dominant provider, and as a result these resellers and aggregators were able to make significant inroads into AT&T's customer base.  The divestiture of AT&T also spawned a new type of telecom provider – Competitive Access Providers (CAPs).  CAPs provided dedicated voice and data circuits to the businesses to bypass the Bells' networks in the top tier cities.

3.  The next major milestone in the evolution of telecommunications markets occurred with the passage of the Telecommunications Act of 1996 (the "Act"), which sought to open local

---

[2] Earnings Before Interest Taxes Depreciation and Amortization.

[3] The divestiture did not impact the hundreds of Incumbent Local Exchange Carriers (ILECs) which served mostly the rural areas of the U.S. not serviced by the seven RBOCs.

5

markets to wholesale and facilities-based competition. In exchange for providing competitors with access to their facilities, the Act provides that the Regional Bell Operating Companies ("RBOC") or Incumbent Local Exchange Carriers ("ILEC") will be allowed to enter into regional long distance markets. This event created the Competitive Local Exchange Carrier (CLEC) by deregulating the market for <u>switched</u> (not just dedicated) local services. The Baby Bells were required to interconnect with CLEC networks, allow CLECs to collocate their own network equipment in switching offices and to lease out to CLECs critical piece-parts of their networks at Total Element Long Run Incremental Cost (TELRIC). In exchange, the RBOCs were eligible to enter the long distance market, once they satisfied certain conditions. Over time, the new laws were subjected to numerous legal challenges, appeals, and changes.

4.  Some CLECs attempted to provide bundles of services and others focused on niche geographic or product markets. The importance of the Act is that it made competitive entry into the telecommunications industry attractive because it facilitated competition for the entire bundle of telecommunications products (local, long distance, and data services). In short, the telecommunications industry has been transformed from a monopolistic market to one characterized by significant innovation and technological development, thus resulting in fiercely competitive pricing and marketing strategies. CLECs sought to build new (and often duplicative) state of the art networks in the hopes of meeting future *presumed* pent-up demand for voice and data services.

5.  Investors and lenders were initially optimistic about CLEC's prospects for the following key reasons:

    i.   The FCC mandated the Bells to provide multiple methods of entry, including leasing network elements at incremental cost.

    ii.  To meet policy objectives, under the legacy regulatory system, the prices for the Bells' <u>business</u> services, local toll, calling features, and carrier access were set artificially high to support affordable rates for consumers. These pricing imbalances represented very profitable cream skimming opportunities for the new competitors.

    iii. While the Bells faced carrier-of-last resort obligations to build out to any requesting customer, CLECs were free to build out where it made the most economic sense to do so, and to target the customers that were the most profitable.

    iv.  Due to advances in technology, the CLECs had the opportunity to build state of the art networks from scratch, using more efficient architectures and benefiting from decreasing equipment costs.

6.  The wave of optimism regarding the CLECs' prospects translated into large amounts of capital pouring into the CLEC industry in the late 1990s in the form of IPOs, bank loans, junk bonds, and vendor financing. Most of the investment community's capital was directed to CLECs that would build large networks covering the most markets. The sector was sometimes labeled

as following a "build it and they [the customers] will come" philosophy.  CLEC valuations and share prices were based on high growth expectations.

7.  By 2000, more than 300 facilities-based CLECs were identified by ALTS, the CLEC association.  The publicly traded CLECs had amassed $31 billion in long term debt to cover continued free cash flow deficits and fund expansive network build out plans.

8.  CLEC debt came in two primary forms, secured bank loans and unsecured bonds.  The bank loans were typically provided by large bank syndicates that required compliance with financial covenants.  Covenants are contractual restrictions placed on a borrower and are an important facet in banks' risk management programs. These contracting devices set minimum standards for a borrower's future conduct and performance and typically accelerate the maturity of the loan in the event of a violation.

9.  By the latter half of 2000, the financial markets and the economy as a whole had retracted from levels in the late 1990s.  Telecom companies began to experience financial difficulty and started to fail.  Despite their dire need for cash, most CLECs discovered that access to the capital markets had become extremely limited:

   i.  Public equity:  The rapid decline in stock prices and general instability of the NASDAQ virtually eliminated the raising of public equity as a source of financing.  A number of CLECs who had filed S-1s to go public had to suspend or cancel their IPO plans in the Summer of 2000, including Birch, NetTel, KMC, and ATG.

   ii.  Venture capital:  Although venture capital firms did continue to provide seed money to certain CLECs throughout 2000, this money was channeled almost exclusively into data CLECs that were providing DSL access or building broadband fiber optic networks.

   iii.  Private equity:  Strategic private equity investments decreased significantly in 2000, a notable exception being Forstmann Little, which injected an additional $250 million to rescue XO Communications  and similarly rescued McLeod Communications, another major CLEC, by investing an additional $175 million in 2002.  Forstmann Little had already injected approximately $1 billion into each through 1999.

   iv.  High yield debt:  High yield debt (junk bonds), once a key source of funding for CLECs, became virtually unavailable to the telecom sector. High yield issues declined after Q1 2000, both in absolute dollars and percentage going to telecoms.  The exception was in 1Q 2001, when McLeod – one of the largest CLECs – received a $750 million issue and sizeable amounts went to several fiber builders and wireless providers, the two areas still viewed by the investment community as emerging leaders in the telecom sector.

7

> v.  <u>Secured Lending</u>: Similarly, secured lenders such as banks severely cut back funding to competitors in the telecom sector, including CLECs, although with some lenders willing to invest more to keep certain of their borrowers financially viable.

10. The bankruptcy wave in the telecom industry began slowly in the second half of 2000, primarily with smaller less mature companies, but increased significantly during 2001 and throughout 2002. During a two and half year period (2Q2000 to 4Q2002) over 150 telecom companies filed for bankruptcy and numerous others liquidated outside of court. Many of these carriers filed for bankruptcy with the intention of restructuring their debts, rightsizing their organizations, and ultimately emerging as a new entity. In the beginning of the restructuring wave, however, the majority of telecom companies that filed for Chapter 11 were smaller and less viable and ultimately liquidated. In liquidations, the customers were transitioned, the networks were shut down, and the employees were fired. Other companies sold their assets and customers in distressed sale processes, which resulted in assets being sold for pennies on the dollar. Liquidations of larger and larger companies occurred especially throughout 2001. By 2002, many of the companies that filed for bankruptcy were larger and were able to restructure their debt and
reorganize.



**Total Telecom Bankruptcy Filings**

8



**No. of Filing by Industry Sector**
**2Q 2000 - 4Q 2002**

11. In summary, during the 1990's and early 2000's the telecommunications market and its participants were exuberant about the future demand for telecommunications services. Spurred by deregulation and readily available capital, numerous new firms entered the market. Significant technological innovation in telecommunications (wireless, prepaid calling cards, cable telephony, Voice over Internet Protocol ["VoIP"]) and internet and broadband (DSL, cable, fixed wireless, satellite, fiber to the home, etc.) transformed the industry and created numerous new types of economically viable competitors to the traditional lined phone companies. In the end, too many competitors entering the market created excess capacity and falling prices across the industry, and many firms either sold, reorganized or liquidated both inside and outside of bankruptcy proceedings.

## E   THE DECLINE OF CLEC'S

1. As financial distress spread in the telecom marketing the availability of new financing dried up. Banks, in particular, became more sensitive to financial performance and they became unforgiving about compliance with covenants and unwilling to give amendments and waivers that they might otherwise have given in normal economic conditions. By 2002, access to the capital markets was very limited. Below is a graphic showing bank loan made to non-incumbents (meaning all types of telecom companies other than the ILECs) from 1999 through 2003. Note the rapid decline in issues from 2000 to 2001. Most of the loans provided in 2001 were to telecom companies other than CLECs, such as wireless companies.

**Number of Bank Loans to Non-Incumbents**



2.  As a result of limited capital availability and poor outlook for the CLEC model, share prices of CLECs dropped substantially. To illustrate the point of CLEC market price decline, the following graphic shows the historical performance of an index of publicly traded CLECs, the NASDAQ composite index, and Allegiance share price index. Note that the CLEC index (and Allegiance stock) shows rapid, unprecedented growth in the years leading up to early 2000 with drastic decline thereafter.



**CLEC Stock Prices (1/4/99 = 100)**

**ALGX versus CLEC Index\***

\* Market value weighted CLEC index includes:  ESCH,MPE ,TWTC,CLEC,ITCD,CBEY,XOCM,MCLD,TALK,PACW,TRIN,KNOL

3. The market conditions at the time leading up to the February 19, 2002 Allegiance press release were extremely poor for CLECs, as numerous CLECs had already gone into bankruptcy, and the equity values of the companies who remained had already fallen to a fraction of their highs in early 2000, as shown in the chart above.

4. Equity investors were also keenly focused on the behavior of secured bank lenders to CLECs, as actions by bank lenders had the potential to push additional CLECs into bankruptcy, thereby destroying all equity value.  Several key events in 2000 through 2001 involving public CLECs are important because they contributed to a change in attitude of the banks that had loaned money to CLECs and an associated change in the way equity analysts and equity investors viewed the risks of investing in CLECs that had secured bank debt outstanding.  Key events highlighted in the timeline below caused a heightened level of concern over financial performance, compliance with bank covenants, and defaults on scheduled interest payments.  I have personal knowledge of all these situations, as I was engaged as a restructuring professional representing either the debtor or the secured lenders in all of these bankruptcies except GST, where I represented a bidder who was not the highest bidder in the auction.



i. The first major financial failure of a CLEC that had constructed a sizable network came in the summer of 2000, when GST Telecom filed for Chapter 11 on May 17, 2000, **citing troubles with their cash flows, an overbearing debt load and the inability to secure additional long term financing**[4]. The company was sold to Time Warner Telecom in 2001 for approximately 75% of its original network cost[5].

ii. In fall 2000, more information began to permeate the telecom market about the shortfalls in demand for data services as compared to prior market expectations and the looming glut of capacity. In September 2000, JP Morgan published a research report highlighting a joint study with McKinsey & Company that clearly laid out the forthcoming troubles. In the Executive Summary of the report it states, **"These underlying economic forces combined with too many industry players have the potential to drive insufficient aggregate returns on capital, in turn driving consolidation and shakeout."**[6]

iii. In late 2000, the largest facilities based CLEC to file for bankruptcy protection, ICG Communications, voluntarily files for Ch. 11[7].

---

[4] GST Telecommunications files voluntary Chapter 11 petition; executes letter of intent with Time Warner Telecom, Company 8K Filing, 5/17/2000, Ex 99.01

[5] Time Warner completes deal for GST, Craig Brown, The Oregonian, 1/11/2001, B03

[6] Backbone! How Changes in Technology and the Rise of IP Threaten to Disrupt the Long-Haul Telecom Services Industry, JP Morgan, September 8, 2000, page 1.

[7] ICG Communications files voluntary petitions for Chapter 11 Bankruptcy protection, Company 8K Filing, 11/14, 2000, Ex 99.1.

iv.  In early 2001, Winstar cuts 2000 jobs or a little less than 50% of its workforce in a desperate attempt to cut expenses[8]. In April 2001 **Winstar announces that it had defaulted on a $75m interest payment on its Senior Debt** blaming Lucent Technologies' failure to pay Winstar $90m per their vendor financing agreement and voluntarily files for Ch. 11 bankruptcy protection[9].

v.  In August 2001, Winstar is unsuccessful in raising its target $300m in DIP financing, only able to attract $175m facility with large fees attached, even though its DIP loan was being syndicated by Citigroup. Winstar hired the Blackstone Group to shop the **company in light of its inability to secure the necessary financing**[10]. Winstar cuts 950 additional jobs[11].

vi.  In December 2001 Winstar is sold to IDT Corporation for a mere $42.5m or roughly 0.05 times revenue[12]. This result came as an absolute shock to the bank market, as the sales process were insufficient to repay the DIP loan, an unprecedented event in any industry and the first time this had happened in any telecom bankruptcy or any material size. Based on my personal experience representing many CLEC bank syndicates during this exact time, the shortfall on the Winstar DIP created shock waves in the bank market and caused many banks to take unprecedented actions to reduce their exposure to the any CLEC.

vii.  In January 2002, another facilities based public CLEC, Network Plus, issued a press release stating that its business plan was currently under-funded by $50m. **Over the prior months, Network Plus had experienced a default on its bank covenants and was unsuccessful in its efforts to restructure its credit facility**[13]. On February 5, 2002, Network Plus filed a voluntary petition for reorganization under Chapter 11[14].

viii.  On March 20, 2002, Network Plus announced the sale of its business to Broadview Networks for only $15.75 million, a fraction of its original network costs and its revenue[15].

---

[8] Winstar Cuts 2,000 Jobs, Rodney L. Pringle, Communications Today, 4/6/2001.

[9] Winstar files for Chapter 11 bankruptcy, John Geralds, vrunet.com, 4/19/2001.

[10] Winstar DIP pricing, fees attest to struggles, Jonathan Berke, The Daily Deal, 8/3/2001.

[11] Rainy days continue for Teligent, Winstar, Hilary Smith, RCR Wireless News, 8/6/2001.

[12] IDT Corp. to purchase Winstar Communications Inc. for 0.05 times revenue, Weekly Corporate Growth Report, 12,24, 2001.

[13] Network Plus enters into limited waiver with its senior lenders and announces engagement of UBS Warburg, Company 8K filing, 1/2/2002, Ex 99.1.

[14] Randolph, Mass., Telecommunications Firm Files for Bankruptcy Protection, Peter J. Howe, Boston Globe, 2/6/2002

[15] Broadview Networks acquires Network Plus "lock, stock and barrel", Company Press Release, 3/20/2003.

F  **REACTION TO THE ALLEGIANCE FEBRUARY 19, 2002 PRESS RELEASE AND EARNINGS CALL**

1. It is my understanding that a key Plaintiff argument is that the drop in Allegiance's share price following a February 19, 2002 press release is largely contributable to a comment regarding reconciliation of line counts made in the press release.  As discussed further below, in my opinion, the line count disclosures were inconsequential to investors and equity analysts, as they paled in comparison to the critical disclosures about revenue and Allegiance's bank covenants.

2. In light of the challenges faced by the CLEC sector at this time, namely over-capacity, extremely tight debt markets, declining prices, the growing number of telecom companies defaulting on their loan covenants, and the growing number of bankruptcies, a company's ability to meet its loan covenants became a strong focus for the investment community.  In Allegiance's February 19, 2002 Press Release and conference call, the Company's executive team disclosed its revenue covenants for 2001 and 2002 as well as their guidance for 2002 quarterly revenue.  As many analysts took note, there was little room to miss Company guidance figures, as the cushion between quarterly revenue and their covenants was becoming very thin in the future.

3. I have reviewed the press release and related analysts reactions.  Based on my experience in the CLEC sector and the actual comments made by the analysts following the release, I believe the line count reconciliation comment was not a material issue that effected the stock price at the time.  Rather, comments about revised financial projections and related tightening of the revenue covenant cushion was of primary concern.  This is not surprising given the jittery credit market at the time and failure of other CLECs to obtain additional funding or looser covenants prior to the press release date.  In essence, banks have pushed other CLECs, such as Network Plus, into bankruptcy and thus the risk of a covenant violation was a huge concern to equity investors.

4. The following is a summary of the key comments made in the February 19, 2002 Allegiance Press Release and Earnings Conference Call and the corresponding analysts reactions to those comments.  Note that analysts paid little notice to the line count reconciliation comment but were certainly concerned about and risk of potential covenant violation.

| Allegiance Press Release & Earnings Conference Call February 19, 2002 | |
|---|---|
| Major Topics | Analyst Reaction |
| Company is in full compliance with all of its loan covenants. Company provides revenue covenants and revenue projections for 2002. | "While shares appear attractive at these levels, puzzling 2002 guidance, lack of insight into organic operations, and a potential covenant violation risk may continue to weigh on the shares until sustained organic growth is demonstrated" (Lehman Borthers - Feb 20, 2002, Case 3:03-cv-02761 Doc 103-4 App 144)<br><br>"(according to our 2002 projected quarterly revenue) the company is within $5-10 million of its covenants each quarter, so there is minimal room for management to bring its guidance down without creating a concern." (Goldman Sachs - Feb 20, 2002, Case 3:03-cv-02761 Doc 103-4 App 160)<br><br>"However, our concern is that, should the company fail to meet guidance, it could come close to violating its bank covenants, which would then set off a liquidity crunch" (CIBC World Markets - Feb 20, 2002, Case 3:03-cv-02761 Doc 103-4 App 121) |
| 4Q01 revenue increased 12.3% from 3Q01 to $151.8 million while EBITDA loss narrowed to $(22.2) million after an adjustment of $5.5 million. | "We continue to remain concerned regarding the impact that a slowing economy will have on both the pace of new revenue bookings as well as customer churn over the next two to three quarters, and we are therefore lowering our '02 revenue forecast and widening our '02 EBITDA loss estimate." (Credit Suisse First Boston - Feb 19, 2002, Case 3:03-cv-02761 Doc 103-3 App 88)<br><br>"With ALGX's 4Q01 results and in an effort to be more conservative in a challenging environment for competitive carriers, we are taking this opportunity to revise our estimates for 2002. For 2002, we now expect ALGX to produce $755 million in revenues...previously, we had projected the Company to generate $789.1 million." (McDonald Investments - Feb 20, 2002, Case 3:03-cv-02761 Doc 103-4, App 151-152)<br><br>"While the company has shown an impressive overall ability to grow very rapidly, we are concerned about the company's ability to replicate this performance in terms of top-line and meaningful margin improvement over the short term in what continues to be a very difficult operating environment." (Bear Sterns Feb 20, 2002, Case 3:03-cv-02761 Doc 103-4 App 116) |
| The Company continued its efforts to automate the manual processes and improve the accuracy and integrity of its back office reporting. In connection with their efforts, net line installations were adjusted downward by 125,000. This had an immaterial ($5m or less) impact on revenue. | "Since most errors were contained in the provisioning system, not the billing system, the impact of revenue was immaterial" (UBS Warburg - Feb 20, 2002, Case 3:03-cv-02761 Doc 103-5 App 181)<br><br>"While perhaps sloppy, we expect this to offer a conservative 'base-line' for future growth." (CIBC World Markets - Feb 20, 2002, Case 3:03-cv-02761 Doc 103-4 App 119)<br><br>"Importantly, the adjustment to net lines installed had a minor impact on revenue (less than $5 million), as the vast majority of the revisions were definitional rather than functional. Therefore, the company's average revenue per line mathematically increased with the lower line count." (Hibernia Southcoast Capital - Feb 20, 2002, Case 3:03-cv-02761 Doc 103-4 App 139)<br><br>"While management has known about both line count issues and has been making adjustments to the financial statements on an ad hoc basis in the past, the company made the adjustment in the fourth quarter in order to provide a clean and coordinated assessment of its line and customer count and to set a single counting and billing methodology going forward." (JP Morgan - Feb 20, 2002, Case 3:03-cv-02761 Doc 103-4 App 141) |
| 135,000 lines were installed in 4Q01 were lower than projected | "Net line installs in the quarter declined on a sequential basis to approximately 135,000. We believe this flat performance is not a reflection of its back office processes or installation capacity, but rather a function of high levels of churn." (Deutsche Bank - Feb 20, 2002, Case 3:03-cv-02761 Doc 103-4 App 125) |

5.  The following graphic shows the decreasing cushion between projected revenue and the revenue covenants.  The cushion decreases from circa 25% to less than 5%.



Source: Company Earnings Conference Call 2/19/2002 (Case 3:03-cv-02761 Doc 103-2 App 40-63)

6.  The Paragon report claims line count was a primary valuation measure for CLECs.  In the late 1990's (after the passage of the Telecommunications Act), it was common to see companies that were still EBITDA negative and cashflow negative reporting various statistics regarding numbers of collocations, miles of fiber deployed, numbers of buildings passed with fiber, numbers of buildings penetrated with fiber, along with the numbers of lines as performance metrics to track their growth.  In the absence of earnings measures, some financial analysts on Wall Street used these operating metrics to discuss relative valuations between companies, although long run valuations were generally based on projected future EBITDA and cashflows.  As the CLEC industry matured, it was held to a much stricter financial standard more typical of other industries.  Valuation metrics shifted from operating metrics plus financial metrics to just financial metrics, with EBITDA and future cashflows being the most commonly used valuation approaches.   The trend was reinforced by the financial distress in the industry during 2000 and 2001.  Investors focused heavily on EBITDA and cashflow, because debt holders cared about whether the leverage that had built up at CLECs could be repaid.  After incurring losses in start-up periods, companies needed to generate EBITDA and positive cashflow to ultimately repay debt.  By late 2001, the growth in line counts mattered little anymore – the question was whether positive EBITDA was being generated, and ultimately whether positive cashflow could be generated, to make required debt service

payments. The bottom line is that any use of line counts as a valuation approach virtually disappeared well before the Allegiance February 19, 2002 press release, and line counts was not a value indicator for CLECs like Allegiance that carried a lot of debt.

7. Paragon also claims that Allegiance had an incentive to suppress or slow down customer disconnects, in order to increase its reported line counts. Since Allegiance, like every CLEC, is unable to bill a customer after that customer has requested a disconnect, slowing down the disconnection of customers would only cause Allegiance to incur the costs of paying the ILEC for the line without getting any revenue. In my experience, any difficulty or time delay in disconnecting lines is viewed by management teams as a negative financial cost, and Allegiance management would have no rationale incentive to do as Paragon suggests.

8. Furthermore, the line count adjustment had no material impact on revenues or EBITDA. The reasons most often cited by analysts for weakened revenue projections were related to the slowing economy and its impact on Allegiance's ability to continue its strong growth and reduce customer churn.

9. As can be seen from the following table summarizing analyst valuation techniques for Allegiance right after the February 19, 2002 press release, the vast majority of analysts following Allegiance's stock did not explicitly value their stock based upon operating metrics such as line count but on Discounted Cash Flows and comparable financial multiples of EBITDA and/or revenues.

| Analyst | Firm | Date | Valuation Technique |
|---|---|---|---|
| Jack B. Grubman<br>Sheri McMahon<br>Shaw H. Kassab | Salomon Smith Barney<br>(Doc 103-3 App 95) | 2/19/2002 | DCF |
| Mark A. Bacurin, CFA<br>Ryan P. Kelly | Baird<br>(Doc 103-3 App 137) | 2/20/2002 | DCF, Multiples of Revenue, Multiples of EBITDA |
| Ryon Acey<br>Ryan Garton | BB&T Capital Markets<br>(Doc 103-4 App 107) | 2/20/2002 | Multiples of Revenue |
| Alexi Coscaros<br>Natasha Selver | Bear Sterns - High Yield Wireline<br>(Doc 103-4 App 117-118) | 2/20/2002 | DCF |
| Cannon Carr<br>Joseph Auotbello, CFA | CIBC World Markets<br>(Doc 103-4 App 119) | 2/20/2002 | EPS |
| Rohit N. Chopra<br>Jeffery C. King, CFA<br>Owen J. Leary | Deutsche Bank<br>(Doc 103-4 App 123) | 2/20/2002 | DCF |
| Mark Rose<br>Mia Gandy | Goldman Sachs<br>(Doc 103-4 App136) | 2/20/2002 | DCF |
| James E. Ott<br>Courtney F. Powers | Hiberia Southcoast Capital<br>(Doc 103-4 App 138) | 2/20/2002 | EPS, Multiples of EBITDA |
| Thomas C. Morabito | McDonald Investments<br>(Doc 103-4 App 152) | 2/20/2002 | Multiples of Revenue |
| Jonathan Atkin<br>David Coleman | RBC Capital Markets<br>(Doc 103-4 App 154) | 2/20/2002 | EV/Revenue |
| Charles W. Pluckhahn | Robertson Stephens, inc<br>(Doc 103-4  App 156) | 2/20/2002 | DCF |
| Cary S. Robinson, CFA | US Bancorp Piper Jaffray<br>(Doc 103-4 App 173) | 2/20/2002 | DCF |
| Colette Fleming, CFA<br>John Hodulk, CFA<br>Glen Waldorf | UBS Warburg<br>(Doc 103-3 App 100) | 2/20/2002 | Multiple of EBITDA |
| Mark A. Bacurin, CFA<br>Ryan P. Kelly | Baird<br>(Doc 103-3  App 136) | 2/20/2002 | Multiple of EBITDA |
| Vik Grover, CFA | KBRO<br>(Doc 103-5  App 197) | 2/20/2002 | DCF targets, EV/Revenue, EV/Line |

**G  LINE COUNT REPORTING**

1. The Plaintiffs' expert report prepared by Paragon Audit & Consulting, Inc. (the "Paragon report"):

   i.   Mischaracterizes the industry use of  FCC Form 477;

   ii.  Vastly over-simplifies the complexity and challenges in measuring "lines"; and

   iii. Implies the challenges and strains on the Back Office / Operational Support Systems ("OSS") for Allegiance were somehow purposeful and not common for a growing CLEC.

2. FCC Form 477, as indicated by the FCC order that implemented the use of the form, had an important but narrow purpose:

   In this Report and Order, we adopt rules and a standardized form (FCC Form 477) to collect basic information about two critical and dynamic areas of the

communications industry: the development of local telephone service competition and the deployment of broadband services. Access to this information will materially improve our ability to develop, evaluate, and revise policy in these rapidly changing areas and will provide valuable benchmarks for Congress, this Commission, other policy makers, and consumers. More broadly stated, we conclude that this information will make more effective our actions to implement the pro-competitive, deregulatory provisions of the Telecommunications Act of 1996 (1996 Act).[16]

3. FCC Form 477 was never intended to standardize line counting for the purposes of public financial reporting. It was only intended to allow for the evaluation of local competition and the deployment of broadband infrastructure on an apples-to-apples basis. When one reviews the specific history and instructions associated with FCC Form 477, there are varied instructions on how to count particular types of lines or services based on whether they are broadband or not and based on the service provider.

4. Paragon gives the impression in its report that all facility types are converted into a voice-grade-equivalent (VGE) basis for reporting purposes. The reality, as documented in the instructions for FCC Form 477, is quite contradictory to this conclusion. Facilities based providers of broadband connections to end user locations report information about those connections in Part IA of the form. The instructions specifically state that the filer should *not* convert into VGE measures any connections reported in Part IA.

5. Part II of the form contains an array of instructions on how to count connections to customers for voice grade service. It is important to note that these instructions relate only to how the FCC wanted to count and compare service. For example, the FCC required that a PRI service should only be counted as 23 voice-grade equivalent lines.[17] There are instances where multiple PRIs are connected together in such a way that all 24 channels are available and it would be reasonable for the CLEC (outside of FCC Form 477) to count all 24 channels. Moreover, there are further instructions provided in Part II that require reductions in VGE counts for DS1s that would apply to the FCC Form 477 reporting, but where CLECs would not customarily limit the count of their circuits in the same way. These limitations specifically relate to only counting partially channelized DS1s as the portion of the DS1 that is channelized.

6. While Paragon may believe that FCC Form 477 and its associated instructions have removed the variation in reporting line counts, it has only partially done so and only with respect to the FCC's analysis. There is nothing in FCC Form 477 that requires that a CLEC count its lines in the same way internally or externally. Moreover, the issue of counting voice-grade-equivalent line counts for broadband connections is not even required in FCC Form 477, contrary to Paragon's understanding.

---

[16]    Before the Federal Communications Commission, *In the Matter of Local Competition and Broadband Reporting*, CC Docket No. 99-301, FCC 00-114 Report and Order, Released March 30, 2000, p. 2.

[17]    FCC Form 477, Instructions for September 1, 2007 Filing, OMB No: 3060-0816, Part II.

7. Some misleading statements made in the Paragon report regarding FCC Form 477 use and my reaction to these statements are as follows:

    i.    *"The VGE is also the measure for line count used across the telecommunications industry."* -- This is patently false. As noted earlier, the instructions for FCC Form 477 specifically state that the file should *not* convert connections reported for broadband services into voice-grade-equivalent measures. The reason for this should be obvious to someone familiar with broadband services. These connections to customers dramatically vary in the amount of traffic that they are carrying at any point in time. While it is theoretically possible to count an OC-3 connection as 2,016 voice connections, if different types of equipment are provided behind that OC-3 connection, many more voice-grade-equivalent connections are available. Simply stating that counting broadband connections in a voice-grade-equivalent manner is not particularly meaningful and was not even required by the FCC as part of the instructions for FCC Form 477.

    ii.    *"Allegiance did not follow FCC requirements and industry standards for reporting line count"* – There is no industry standard for how a company internally reports its line counts or publicly reports line counts. As noted above, the FCC established standards for certain types of lines so that it could compare the level of competition in different parts of the country and the extent to which broadband connections were being deployed across the country. However, these standards that the FCC implemented for its own comparison purposes are not required throughout the industry for public disclosure or internal counting purposes. Finally, within the instructions for Form 477 it is stated that filers may provide "good faith" estimates of counts and use "best practices" to get those estimates. There are no explicitly stated industry standards for reporting line counts.

8. In order to understand the complexities and nuances of line measurement in the telecommunications industry, it is necessary to obtain a fundamental understanding of network design, the services that Allegiance offered, circuits employed, and the inter-relationship of back-office systems necessary to operate a CLEC.

9. It is useful to understand the key network elements of a standard voice network to appreciate the challenges in objectively measuring line count. The first useful distinction is to understand the network infrastructure contained within a single market (often called "local" or "metro" network) as compared to the network that connects markets together (often called "long haul" network). The following are the basic elements, on a greatly simplified level.[18]

    i.    Connections within a Market

---

[18] Note that the above simplistic description of a standard network design is tailored to a voice network. Data or internet networks use a different technology, typical Internet Protocol ("IP"), but the physical network requires the same types of elements.

(A)   Switch – A network within a market starts with a central location containing a switch and other related network equipment. This is generally contained in a building referred to as a "central office" or a "POP" (point of presence).

(B)   Connection from Switch to End Office – The next element is the transport circuit between the switch and the End Offices. ILEC end offices are more numerous, and they function as aggregation points within neighborhoods in a city. Local transport networks are typically built on fiber rings,[19] often referred to as "metro fiber" networks.

(C)   End Office Equipment - Equipment placed in an end office performs numerous functions but generally is used to aggregate traffic onto the network and send the traffic back to the Switch or POP. CLECs that put equipment in the ILEC end offices are said to be "collocating," so these facilities are often referred to as "collocations" rather than end offices.

(D)   End Office Connection to a Customer Building – Typically call the "local loop" or "last mile connection," this is a circuit which terminates at the customer premises. Note that some business models bypass the ILEC End Offices and connect directly from a POP to customer premises, often by splicing a fiber pair off of a metro fiber ring and running the fiber pair into a customer building location.

ii.   Connections Between Markets – Transport circuits between POPs or local market Switches are called "long haul" connections, which consists of bandwidth on fiber that connects cities and generally terminates in large central office locations or POPs of the largest carriers.

10. The following diagram is a summary of Allegiance Interconnection as it relates to the telecom services that are provided and billed between carriers (e.g., Allegiance and the ILECs, CLECs and IXCs). Carriers may provide leased facilities, features, transport, termination, origination, and other services to Allegiance that are billed throughout the month. Conversely, Allegiance will provide and bill these same services to carriers. These services and the related costs/revenue make up Interconnection. Revenue is generated based on billings from Allegiance's CABS (Carrier Access Billing System) known as CHA. Costs are based on CABS bills that are received from the interconnect partners throughout the month. Below is a high-level example of where Allegiance billed its end-user customers for providing service, and the interconnect carriers bill Allegiance for providing local and long-distance service. The reverse, for example, would happen when Allegiance was on the receiving end of local traffic from other carriers. One point that highlights the difficulty in determining accurate counts of active services is that the CLEC industry is notorious for "disputes" between the various

---

[19] A ring design provides two paths between any two end points on the ring, such that a fiber cut or service disruption in one spot on the ring does not disrupt traffic flow because the traffic can just flow the other direction around the ring.

interconnecting parties, pointing to the complexities of accurately identifying "billed lines".



11. Allegiance offered numerous services to it's customers including voice, data, bundled (voice and data) and wholesale services offered through Unbundled network Elements (UNE's) and higher capacity circuits. The various service offerings and transmission / transportation methods adds complexity to measuring "line count" with a simple "objective standard" for any CLEC, including Allegiance. The following is a summary explanation of Allegiance's telecommunication service offerings:

   i.    **Local Telephone Services** – Basic local telephone services, as well as additional features such as call forwarding, call waiting, caller ID, call transfer, automatic call back, distinctive ringing, station-to-station four-digit dialing without a private branch exchange, and voice mail. Dial tone service is offered via Unbundled Network Elements ("UNE") or multiple lines can be provisioned via a high capacity T1 circuit.

   ii.   **Long Distance Services** – Includes "1+" outbound calling, inbound toll-free service, calling cards, operator assistance, and conference calling. These services are leased through the local carrier or provided through long distance carriers.

   iii.  **Broadband and Other Internet Services** – Includes high speed data transmission service such as dedicated broadband Internet access through wide area network interconnection, managed modem port service ("MMPS"), and IP aggregation. Also includes web hosting, email, and domain name registration.

   iv.   **Bundled Services** – Allegiance also offers packages where voice and data services are bundled together. For example, an integrated voice and data offering over a single high capacity line (known as the Total Communications ["TC"] and Integrated Access ["IA"] products).

12. Allegiance offered its services using varying capacity circuits and network architecture. For example, at the basic, single line voice level, one telephone line is called one DS-0. A T-1 circuit is capable of carrying 24 DS-0's. A DS-3 (or OC-1) circuit can carry 28 T-1's, or 672 DS-0's (24x28). Complexities in "line count" arise when providing higher capacity circuits, or other broadband services including Digital Subscriber Line ("DSL"), dial-up services, bundled services where voice and data are on one circuit, services where a circuit or switch port is "oversubscribed," "burstable services," etc. The following table is a summary of circuit capacities.

| Digital Signals | | Framing & Control | |
|---|---|---|---|
| DS-0 | | | 64 kbps |
| | x 24 | 8 | |
| DS-1 | | | 1.544 Mbps |
| | x 28 | | |
| DS-3 | | 1.768 | 45 Mbps |

| Optical Carrier | | | | DS-3 Equivalents | DS-1 Equivalents | DS-0 Equivalents |
|---|---|---|---|---|---|---|
| | OC-1 | | 51.84 Mbps | 1 | 28 | 672 |
| | | x 3 | | | | |
| STS-3 | OC-3 | STM1 | 155.5 Mbps | 3 | 84 | 2,016 |
| | | x 4 | | | | |
| | OC-12 | STM4 | 622.1 Mbps | 12 | 336 | 8,064 |
| | | x 4 | | | | |
| | OC-48 | STM16 | 2.5 Gbps | 48 | 1,344 | 32,256 |
| | | x 4 | | | | |
| | OC-192 | STM64 | 10.0 Gbps | 192 | 5,376 | 129,024 |

13. The Paragon report alludes to a simple choice of taking line counts from "billing" rather than "order entry."[20] The Paragon report fails to describe the complexities of CLEC OSS systems, particularly when a company is rapidly growing with new customers and service offerings. In short, CLEC back office support systems can be quite complex and they require coordination and reconciliation across separate functional areas and systems. **It is not uncommon for any CLEC (especially one with Allegiance's growth rate and size) to require certain manual processes and reconciliations between the components or occasionally to experience time delays to accurately order, install, provision, bill, or de-install / remove line information from any given system.** The following diagram is a functional overview of a typical CLEC OSS.

---

[20] The Paragon report then goes on to admit that even using the billing system would be inaccurate (pg. 13, section 15 (a) v).



14. The Paragon report states that "*The VGE is also the measure for line count used across the telecommunications industry*" - This statement is an over-simplification and is incorrect. In reality, it is not uncommon for different CLEC's to report lines differently. In my experience in the industry, I have seen all of the following line reporting methods used by different CLECS:

    i.    Number of total "circuits" (i.e. either a T-1, Ds-3, etc.);

    ii.    Number of circuits divided by average channelized service;

    iii.    Total potential to be used (e.g. 24 DS-O's per T-1);

    iv.    Actual channelized service (DS-O's or VGE's) ;

    v.    Divide circuit revenue by assumed Average Revenue Per Unit (ARPU) - particularly for broadband;

    vi.    Assume any data service is one line regardless of speed;

    vii.    Assume each 64 KB speed is one line.

15. Indeed, there are several similar terms use to describe a line, including but not limited to:

    (A)    VGE – Voice Grade Equivalent;

D. App. 0022

      (B)     VLE – Voice Line Equivalent;

      (C)     ALE – Access Line Equivalent;

      (D)     UNE – Unbundled Network Element;

      (E)     DS-O'- Digital Signal, level 0.

16. In summary, Paragon's oversimplified statements regarding line reporting are misleading, and FCC form 477 is not applicable to public financial reporting.

***

## RIGHT TO SUPPLEMENT AND CERTIFICATION

My observations and opinions are based on an independent examination of the documents provided by both parties in this case and my professional experience. I may find it necessary to supplement and amend my opinions if additional information becomes available. Similarly, I may need to incorporate court rulings, parties' stipulations, and discussions with witnesses and future testimony. I reserve the right to update this Report based on additional information that becomes available.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of December, 2007.

Carlyn R. Taylor, MA, CPA, CIRA



# Carlyn R. Taylor, CPA, CIRA, ABV

Senior Managing Director – Corporate Finance

carlyn.taylor@fticonsulting.com

7887 E. Belleview Avenue
Suite 650
Englewood, CO 80111
Tel: (303) 689-8858
Fax: (303) 689-8801

**Certifications**
Certified Public
Accountant, California and
Colorado

Accredited in Business
Valuation (an AICPA
designation)

Certified Insolvency and
Restructuring Advisor

**Professional Affiliations**
American Institute of
Certified Public
Accountants

California Society of
Certified Public
Accountants

Organization of Women
Executives

**Education**
B.S. / M.A. in Economics
(Honors Dual Degree
Program), University of
Southern California

Executive Education,
International Business
Program, Harvard
Business School

Carlyn Taylor is a senior managing director in FTI's Corporate Finance practice and is based in Denver. Ms. Taylor is the national leader of the Telecommunications Industry practice for Corporate Finance and the national coordinator of Communications and Media for all of FTI.

Ms. Taylor's experience consists of hundreds of consulting engagements, including restructuring and bankruptcy; strategic planning; due diligence; and transaction support, litigation, and valuation. She specializes in telecommunications, including IXCs (long distance), data carriers, fiber optic networks (terrestrial and subsea), CLECs, broadband, internet connectivity (ISP and web hosting), cellular, PCS and international carriers.

## Professional Experience

### Reorganization & Bankruptcy Engagements

- Advised bank syndicate groups, company management and bondholders in the assessment and/or restructuring of more than 85 troubled telecom companies, including:

- Over 50 CLECs, including fiber build, smart build, wireless, and data

- Approximately 15 national and regional IXCs, including long haul and metro loop fiber, voice and data transport products

- Internet service providers (ISPs)

- International carriers, including long distance, sub-sea cable, and data

- Web hosting companies

- Mobile wireless carriers and resellers

- Cable TV and cable overbuilders

- Example material public engagements on which she has served as a lead restructuring advisor for the client, including both in and out-of-court restructurings or material amendments to credit agreements, include:

- **McLeodUSA** – Represented the secured lenders in the second bankruptcy of McLeod. Assessed all aspects of the business, assisted the company in making numerous changes to the business operations to improve profitability and helped the creditors structure a pre-packaged bankruptcy filing, which successfully emerged from bankruptcy in less than 75 days. Participated in selection of the new chief executive officer (CEO) and the entire new board.

- **Global Crossing** – Represented senior lenders in bankruptcy. Assessed all aspects of the business, including products, network, cost structure, capex and international operations.

- **XO Communications** – Represented senior lenders in the bankruptcy. Assessed all aspects of the business and supported negotiations to sell the senior debt position to Carl Icahn.

- **Williams Communications** – Represented senior lenders pre- and post-bankruptcy. Assessed business and plan, including analysis of private line and IP products and the market

size and growth potential. Negotiated all aspects of the restructuring. Loan was partially repaid during bankruptcy and refinanced in full two years later.

- **Broadwing** (now Cincinnati Bell) – Led senior lenders' assessment on the analysis and disposal of the IXC, by sale to Corvis, renamed Broadwing.

- **Level 3 Communications** – Performed extensive business plan evaluation and negotiated the terms of the 2002 major amendment to the secured credit agreement. Loan was refinanced in full in 2003.

- **Excite@Home** – Performed full business plan analysis for board of directors prior to the bankruptcy and represented the company through the bankruptcy. Business plan assessment included extensive analysis of products and paybacks by MSO.

- **Qwest** – Performed business plan and liquidity analysis in connection with the 2002 amendment to the senior credit facility.

- **Genuity** – Represented a syndicate of lenders who were the primary unsecured creditors. Assessed all aspects of the business and co-led negotiations between the buyer, Level(3), the bank group and Verizon surrounding the sale and transition of the business.

- **Rural Cellular** – Represented senior lenders in connection with the amendment to allow the 2003 bond refinancing. Assessed all aspects of the business and liquidity, including roaming and rural holdings and valuation of collateral.

- **IWO** (Sprint Affiliate) – Represented the senior secured lenders for three years, from the initial payment default in 2002 until the refinancing in full in 2005. Worked cooperatively with the management to cut costs, improve liquidity position and improve financial performance. Negotiated the restructuring which resulted in payment in full for the lenders.

**Consulting Engagements:  Performance Improvement & Strategic Advisory**

- Leading a long term FTI project with multiple phases to improve the financial performance of a regional ILEC that sells a broad range of wireline and wireless voice and data products to both consumer and business customers. Phase I involved a complete cost mapping exercise to understand the drivers of costs by product and customer type as well as customer segmentation analysis. Phase II was a detailed pricing analysis and an in-depth review of the business markets products and pricing. Phase III is a core process simplification.

- Worked with dozens of CLECs to analyze their costs and product and customer net present values (NPVs). For example, in an engagement for one board of directors, FTI conducted detailed interviews of middle managers in all of the core operational functions of the company; analyzed the cost structure of core processes; and made a series of recommendations to reduce headcount (with specific recommendations by function and job title), collapse certain core functions, eliminate functions, implement new processes and IT enhancements to reduce costs and re-organize the sales organization to improve productivity. This engagement resulted in a sizable cost reduction and the company now has EBITDA margins of greater than 20 percent. In another CLEC, FTI spent two months assessing the sales and provisioning processes, the profitability by collo and market and the SG&A costs. A 90-day cost reduction plan resulted in EBITDA tripling from a run rate of approximately $1.5 million per month to $4.5 million per month.

- Project leader for over a dozen consulting engagements in the cellular industry, including

realignment of the marketing strategy upon entry of PCS competitors, analysis of pricing plans and consumer behavior in response to promotions, valuation of subscribers and analysis of agent commissions systems.

- Led engagement by a metro data/fiber provider to analyze its cost structure and build a dynamic product profitability model which could be used on a real time basis to price large data contracts. The model included detailed modules for costing out incremental capex, variable SG&A, a complex commission structure, multi- versus single-year contracts and all variable costs.

- Led strategic planning work for a U.S. tower operator regarding the potential for entering multiple new markets. Work included competitive analysis of the existing and new markets, financial benchmarking, demand analysis, competitor analysis and identification of strategic alternatives.

- Performed a market study for a major international wireless and networking equipment manufacturer. Work included thorough review of a new market, identification of potential strategic partners, interviews of customers and strategic partners, and advice to the manufacturer on strategic alternatives.

- Led strategic planning engagements to develop the business plan for the following types of companies:

  - Data CLEC targeting a particular segment of the real estate market.

  - Undersea cable owner, cable landing station operator, and international LD provider.

  - Full service telecom company in Mexico with licenses for mobile, wireless local loop, domestic and international long distance, and data services.

  - Major city's municipal electric utility company launching a telecom business.

  - Internet technology company with patents for controlling remote devices over internet portals.

  - Internet based exchange for the consumer packaged goods industry.

  - Company planning "smart homes" advanced telecom services for planned developments.

  - Cable overbuild company.

  - RBOC launching VDSL services to residential areas.

**Consulting Engagements:  Merger and Acquisition Advisory and Due Diligence**

- Supported numerous investment banking engagements with FTI Capital Advisors and previously PricewaterhouseCoopers (PwC) Securities.  Examples include:

- **Integra Telecom** – Raised $170M of private debt for a Northwest facilities-based CLEC.

- **Broadview Networks**  –  Advisor to the board on merger with Bridgecom. Work included the preparation of a new strategy and business plan, liquidity preservation, negotiation of amendment with secured lenders and support of FTI Capital Advisors in diligencing merger partners and negotiating the merger. Also served as industry reviewer for a fairness opinion.

- **Going Private Transaction** – Provided diligence and business plan analysis for a merger in connection with a going private transaction.

- **Distressed Asset Sales** – Advised companies on the sale of assets in Chapter 11 proceedings or in- and out-of-court liquidation, including Network Plus, CoreExpress, Excite@Home and Fairpoint (CLEC subsidiary).

- **Verizon Hawaii** – Provided due diligence to bank debt and bond underwriters.

- **Sale of a Division** – Special advisor to the management of a large telecom company seeking to divest a major operating division. Work included extensive financial modeling and valuation analysis of the division, assistance with organizing the transitional operations structure and advisory services on the term sheets and contracts.

- **Due Diligence for Financing Sources** – Led due diligence and business plan assessment engagements on behalf of financing sources for numerous telecom companies, including a networking equipment manufacturer fixed wireless broadband carriers; E-consulting firm with CRM products and services; datacasting business to provide broadband data download services via broadcast television frequencies; specialized satellite communications providers; long distance resellers; cellular carriers; and numerous CLECs including international, internet service providers, internet web hosting provider and wireless vehicle location.

- **Altrio** – Raised $200 million of equity capital for a cable overbuilder company constructing hybrid fiber coax system in Glendale, CA and other areas in Southern California.

- **Miditel** – Represented the Mexican owner in joint venture and investment negotiations with Craig McCaw's Eagle River and Hutchison Whompoa.

**Litigation Engagements**

- Experience in litigation expert witness work consists of more than 200 engagements in a 15-year period, including more than 40 cases in which Ms. Taylor has been designated as an expert witness. Types of cases include breach of contract, patent and trade secrets, securities litigation, class action cases involving telecom billing matters, bankruptcy litigation (fraudulent conveyance, etc), and antitrust claims. Areas of expertise on which she has testified involve telecom industry market conditions, lost profits analyses and valuation. The following is a list of testimony as well as some examples of other material engagements:

- Testified on valuation and damages involving the sale of a CLEC which offered prepaid local services.

- Testified regarding damages in an access rate dispute.

- Testified in an international arbitration between a venture capital fund and a foreign investor. Scope of analysis included analysis of conditions in the telecom industry at the time of major investments, analysis of the pace of investment, review of the due diligence conducted by the VC fund prior to making the investments and analysis of selected portfolio companies.

- Testified regarding valuation of a prepaid calling card company in a fraudulent conveyance action.

- Testified in Global Crossing bankruptcy proceeding on industry practices surrounding major vendor contracts and relationships.

- Testified on GAAP accounting issues for telecom companies in a dispute between investors in a PIPE transaction and the company, who ultimately filed for Chapter 11 and liquidated several years after the transaction. The company was an international long distance provider.

- Testified in theft of trade secrets case involving the development of an internet protocol optical

router.

- Testified regarding valuation of minority interests in cellular licenses in MSAs 241 and higher throughout the country.

- Testified regarding telecom industry conditions, standard contract terms and financial analyses regarding a contract allegedly to provide pay phone, voice, and data services to a hospital chain.

- Testified on issue of lost profits damages in dispute involving the purchase of an internet service provider (ISP) by a large, national ISP. Issues included analysis of subscriber base and churn.

- Testified in litigation regarding loss of incentive stock options during a telecom merger transaction. Work included valuation of stock options plus analysis of two start-up telecom companies.

- Testified in litigation between a wireless reseller and a manufacturer of wireless phones. Issues involved lost profits and valuation of the company.

- Testified in multiple arbitration proceedings involving agents of cellular companies. Issues analyzed included damages, financial performance of the agents' businesses, financial performance of a promotional program run by the carrier and analysis of activation records to identify fraudulent activations in connection with a commission fraud scheme by an agent.

- Analyzed disputed commission calculations on the sale of undersea capacity.

- Analyzed a breach of contract litigation involving an alleged exclusive telecommunications services contract with a large national chain of businesses. Issues involved damages, valuation, design and operations of key telecom services (including data and voice), and ability of contractor to provide various services.

- Conducted valuation analysis of cable television, MMDS, telephony and data business in Ireland and filed expert report analyzing a sale transaction involving allocations of proceeds between the various businesses.

- Conducted a study of the Mexican telecommunications market and prepared an expert report discussing trends in deregulation, pricing, competitors and valuation of licenses.

- Led engagement advising MCI Worldcom in defending against claims by cable and wireless involving the sale of MCI's entire internet business, including backbone and customers. Analysis includes liability as well as damages issues.

- Analyzed damages in a litigation between a cellular carrier and its out-sourced call center provider.

- Analyzed lost profits and valuation issues on behalf of a cellular equipment manufacturer who was sued by a cellular carrier.

- Analyzed municipal taxes paid by a national cellular carrier, including tax calculations and allocations to various municipalities.

- Led consulting engagement to calculate billing differences between multiple methods of billing cellular telephone calls to consumers, including the effect on roaming traffic, long distance billings and home area calling.

- Led consulting engagement to design a class action settlement structure for cellular

subscribers in a large metropolitan area. Work included analysis of carrier's cost structure, classification of customers, construction of financial models to project financial impact of various structures and assistance to counsel in negotiating a settlement.

- Analyzed financial issues and damages in price fixing litigation cases involving the cellular service industry. Work included analysis of proxy markets across the country; valuation of cellular and PCS licenses and net cash flows; study of cost structure and long run marginal costs (including system expansion costs); and analysis of customer characteristics, value on an NPV basis and behavior in response to price plans or promotions.

- Performed analyses of equipment pricing and cellular distribution systems in multiple cellular cases involving allegations of below cost pricing of phones. Work included analysis of phone pricing, analysis of phone wholesaling and service reselling businesses, and analysis of lost profits of cellular agents.

- Analyzed the financial performance of a data CLEC providing DSL service and filed an expert report on the structure and relative success of its financing rai sing activities.

### Auditing

- Performed audits and reviews of both privately held and public entities, including defense contractors, video production equipment company, asbestos removal company, international import/export company and a private university.

### Professional and Business History

- FTI Consulting Inc., became FTI national leader of Communications & Media industry, 2005

- FTI Consulting Inc., Senior Managing Director, September 2002 to Present

- PricewaterhouseCoopers, Partner, 1998 to August 2002 (youngest partner in PW history)

- Price Waterhouse, Consultant to Senior Manager, 1990 to 1998

- University of Southern California School of Accounting, Part-time Professor, January 1993 to December 1995.

### Honors and Awards

- Valedictorian -- University of Southern California

- AICPA Elijah Watt Sells High Distinction Award - Top 100 in U.S. on CPA Exam

- Price Waterhouse Client Service Award

- Outstanding Undergraduate Award - Omicron Delta Epsilon (U.S.C. Economics Honor Society)

- Phi Beta Kappa National Honor Society

- Phi Kappa Phi National Honor Society

- J. Wesley Robbs Human Values

### Speeches

- "Major Telecom Restructuring," Law Seminars International, New York City

Carlyn R. Taylor

- "Distressed Telecom Restructuring," Practicing Law Institute, New York City
- "Distressed Telecom Panel," Goldman Sachs Distressed Debt Conference, Mohonk, New York
- "Telecommunications Restructuring Panel," Business Recovery Services Symposium, Aspen, Colorado.
- "Intellectual Property in the Telecom Industry," IP Leadership Forum .
- "Distressed Telecom Valuation," RMA Senior Lenders Telecom Roundtable.
- "Rooftop Leasing and Other Telecom Uses for Commercial Space," National Council for Real Estate Investment Fiduciaries.
- "Venture Capital and Telecommunications," Harvard Business School Venture Capital and Principal Investment Club conference.
- "Wall Street Gone Wireless – Time Tested Systems Delivering Real-time Information," Cellular Telephone Industry Association Wireless IT 1999 conference.
- "Emerging Regulatory Issues in Communications," Digital Coast 99 at Directors Guild of America.
- "Emerging Dynamics of the Telecom Industry," Troubled Company Restructuring Conference in Vail, Colorado.
- "Successful Case Presentation: How to Prepare and Present Your Case to Law Enforcement for Prosecution," AICPA Conference on Fraud, Las Vegas, Nevada.
- "Conducting an Internal Investigation,"  Institute of Internal Auditors, Washington D.C. and Los Angeles conferences.
- "White Collar Crime Schemes,"  Fraud Symposium sponsored by Revisuisse Price Waterhouse, Zurich, Switzerland.
- "Getting the Most from Expert Witnesses,"  Women Litigators Conference, San Francisco, California.
- "Seeing the Forest with the Trees: Decision Trees in Valuation & Settlement," Intellectual Property Leadership Forum, Tucson, Arizona and  Legal Tech, Los Angeles, California.

## Articles

- "Finding Values in the Internet & Telecom Meltdown," article in Association of Insolvency and Restructuring Advisors (AIRA) News, Winter, 2002.
- "Irrational Roaming Exuberance," guest editorial in Wireless Week, November, 1998.
- "Out of Gas or Just Idling? Mexico's Telecom Infrastructure Race"; "Prepaid Wireless—It's Not Just for the Credit-Challenged Anymore;" and "Telecom Trouble Signs," a series of articles for CTI, January, March and April 1999.

## Expert Testimony (Last 7 years)

- Atkins v. Tracfone (deposition) 1/06
- US Telepacific v. Qwest Communications (deposition) 10/05
- J.J. Celcom v. AT&T Wireless Services (deposition) 3/05

- Starling v. Crescendo Venture Partners IV (arbitration) 2/05
- EOS Partners v. Novo Networks (deposition) 1/04
- Allegiance Telecom Ch. 11 Proceeding (deposition) 12/03
- PT-1 v. IDT; adversary proceeding in PT-1 Ch. 11 (deposition) 12/03 & 1/04
- Vertex v. BigZoo Telecom (arbitration) 1/03
- Global Crossing Ch. 11 Proceeding (deposition) 9/02
- Cellular Phone Wholesalers v. Brix Company, Verizon (deposition) 8/02
- Alcatel v. Chiaro Networks (deposition) 3/01
- Dobiescz v. Columbia HCA (deposition) 3/01 and (jury trial) 6/01
- SOS Wireless v. Rockwell, et al. (deposition) 12/00 and (arbitration) 2/01
- Sun America, AIG v. Joplin (deposition) 6/00 and (arbitration) 8/00
- Cohen v. BellSouth Mobility (fairness hearing) 6/00
- Adams, et al. v. AT&T Wireless Services (deposition) 6/99
- Pickrell v. Compute Intensive, Inc., Verio, et al. (deposition) 5/99
- Whelan v. MCI/Worldcom (deposition) 3/99
- LA Cellular v. Excellular Communications (arbitration), 6/98, 7/98, 8/98

**APPENDIX B - Documents**

I have reviewed and/or relied upon the information contained within the following documents:

1.  The Amended Class Action Complaint.

2.  The Plaintiff's Supplemental Submission Regarding Class Certification Loss Causation Issues.

3.  Second Report of Candace L. Preston (the "Preston Report").

4.  Allegiance Telecom Press Release issued February 19, 2002.

5.  Allegiance Telecom 4Q 2001 Earnings Conference Call February 19, 2002.

6.  Allegiance Public Financial Reports:

    a.  10K-A for Fiscal Year Ended December 31, 2000

    b.  10K for Fiscal Year Ended December 31, 2001

    c.  10K for Fiscal Year Ended December 31, 2002

    d.  10Q for Quarter Ended September 30, 2001

7.  Several hundred pages of analyst reports from some of the world's leading securities firms including Goldman Sachs, JP Morgan, and UBS.

8.  Communication between analysts and Company management including:

    a.  Company presentations to analysts.

    b.  Letter from analysts regarding requested data and/or meeting time with Company management.

9.  Expert Report of Paragon Audit and Consulting, Inc (the "Paragon Report").

10. FCC Form 477 and related exhibits:

    a.  Company Form 477 filings from 2000-2001

    b.  Instructions for filing Form 477

11. The following depositions and related exhibits:

    a.  Royce Holland (October 5, 2007)

     b.     Anthony Parella (October 15, 2007)

     c.     Ryon Acey (August 30, 2007)

     d.     Jon-Marc Baird (January 5, 2005)

     e.     Brett Messing (October 25, 2004)

     f.     Denise Crane (January 28, 2005)

     g.     Christine B. Kornegay (September 4, 2007)

     h.     Thomas M. Lord (September 28, 2007)

     i.     Marla Messing (October 26, 2004)

     j.     Clay Myers (September 20, 2007)

     k.     Joe Timothy Naramore (December 14, 2004)

     l.     Terri Smith (September 19, 2007)

12.     Documents provided by various banks which outlined, among other things, internal processes related Allegiance's Back Office Operations and the credit facilities extended to Allegiance.

13.     All Allegiance press releases during the time period.

14.     Documents distributed to analysts, banks, auditors and other parties of interest during the period.

15.     Reports outlining the Company's efforts to reconcile its line count as well as the functionality of the various internal reporting systems Allegiance utilized.

16.     Reports, documents and memos generated by auditors Arthur Andersen in relation to their efforts to audit the Company's financial reporting data.

17.     Court documents related to legal proceedings involving Allegiance.

18.     All other documents filed by the Plaintiff.

**APPENDIX C – Glossary of terms**

*Key Processing Systems:*

- **Switch** – Networking system that records call events being sent or received over the telecommunications network.

- **Mediation System** – System that receives call events from the switch and formats them into call detail records, then guides them to the appropriate billing platform.

- **COE (Consolidated Order Entry)** – Ordering system used to enter sales orders/disconnects.

- **TBS (Telecom Business Solution)** – Provisioning system that interfaces with the switch, billing and other Telcos to activate/deactivate accounts.

- **CABS (Carrier Access Billing System)** – System used to bill carriers for interconnect charges.

- **JD Edwards** – Financial Accounting package.

- **Experion** – Third party vendor software that "scores" customers based on their credit rating.

*Telecom Terminology:*

- **Billing Cycle** – Represents the time period in which a customer bill is generated (e.g., billing on the 15th of each month). There are multiple billing cycles throughout the month.

- **CDR (Call Detail Record)** – Represents calls that have been recorded at the switch and are placed into a standardized format in Mediation.

- **Churn** – Term used to describe a customer that leaves a provider's service.

- **CSR** – Customer Service Representative. Individual that assists/interfaces with the customer in addressing customer needs/questions.

- **Interconnection** – Relates to traffic that is being passed or interconnected between carriers, whereby a fee is assessed to the other carrier (e.g., a CLEC terminating traffic for a long-distance carrier).

- **LEC (Local Exchange Carrier)** - Any Bell Operating Company or independent carrier that provides local service. ILECS are the incumbent carriers, and CLECs are competitive carriers that compete with the ILECs.

- **MACD** – Represents Modifications, Adds, Changes and Disconnects made to a customer's account.

- **MRCs** – Monthly Recurring Charges. Standard charges that are assessed to customers on a monthly basis.

- **NRCs** – Non-Recurring Charges. Charges that are assessed to customers on a one-time basis (e.g., set-up fees).

37

- **Provisioning** – Generic term for processing/activating a customer's account in the key processing systems (e.g., switch, billing).

- **Reciprocal Compensation** – Compensation paid for local traffic that is terminated by one carrier on behalf of the other, and vice versa.

- **TN** – Telephone Number.

- **Traffic** – Generic term used to represent call records.

- **UNE** – Unbundled Network Elements.  Refers to network elements such as local loops, ports, fibers, links, line splitting, and packet switching that may be separately sold to the customer.

- **VRU** – Virtual Response Unit.  Customer Care system that provides automated assistance to customers to answer basic customer questions, preventing the need for CSR intervention.