UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| OSCAR PRIVATE EQUITY INVESTMENTS, INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS, <br><br> V. <br><br> ROYCE J. HOLLAND AND ANTHONY PARELLA, DEFENDANTS. | NO. 3:03–CV–2761–K <br> ECF |

### DEFENDANTS' SUBMISSION ABOUT *FLOWSERVE*'S IMPACT ON CLASS CERTIFICATION

The Fifth Circuit confirmed that a class cannot be certified unless the plaintiffs prove the existence of a misrepresentation *and* loss causation by a preponderance of admissible evidence. *Alaska Elec. Pension Fund v. Flowserve Corp.*, No. 07-11303, 08-10071, – F.3d –, 2009 WL 1740648 (5th Cir. June 19, 2009). Here, Lead Plaintiffs failed to prove either. The alleged disclosure confirmed what the market already knew: Allegiance might make a revenue-neutral switch to new billing software and reconciliation of system-wide databases. The record also shows that unrelated forces caused the stock-price drop after the February 2002 press release. The record does not support class certification.

1. ***Flowserve* reaffirms core tenets of the Fifth Circuit's class certification inquiry.**

*Flowserve* reaffirms that plaintiffs' loss-causation allegations are not assumed to be true. *Flowserve*, 2009 WL 1740648 at *5. Instead, plaintiffs must prove all Rule 23 requirements by a preponderance of the evidence. *Id.* at *5. Moreover, the Court should ignore any overlap with the merits. *Id.* Finally, in a fraud-on-the-market case (such as this one), plaintiffs must prove *both* a misrepresentation *and* loss causation. *Id.* at *5-6.

To prove loss causation, plaintiffs must prove that a lie made its way into the marketplace, later came to light, triggered a stock price drop, and then caused plaintiffs' loss. The "corrective"

disclosure need not mirror the earlier statement. *Id.* at *6. But the disclosure must be sufficiently "related to" an earlier, false, non-confirmatory, positive statement to allow the Court to find a causal link. *Id.* at *7. Alleged disclosures that are merely confirmatory cannot prove a causal link because news already known to the market does not affect stock prices. *Id.* at *9. Nor can changes in economic circumstances, investor expectations, or industry-specific conditions prove a link. *Id.* at *6. The Fifth Circuit reviews class-certification orders for abuse of discretion, recognizing the factual nature of the inquiry. *Id.* at *4.

**2. Lead Plaintiffs have not met their burden of proving the existence of a misrepresentation.**

Plaintiffs allege that in 1Q01, 2Q01, and 3Q01, Allegiance reported a false number of "lines installed." They claim Allegiance's 4Q01 press release exposed the "falsity" of these numbers by announcing a database reconciliation. They have no evidence to support these allegations. The 4Q01 press release did not say the earlier "lines installed" numbers were false or incorrect[1] — Allegiance *never restated* an earlier-reported number. The "lines installed" numbers were accurate when made; they remain accurate. If there had been a restatement, a financial metric would have changed. But revenues never changed. Expenses never changed. Debt never changed. No "restatement" exists in the record. Lead Plaintiffs have not met their burden of introducing admissible evidence of a misrepresentation.

Further, Carlyn Taylor, an expert on companies like Allegiance, "crawled all over" Allegiance in 2002-2003 while working for the lenders that forced Allegiance into bankruptcy. She found no misrepresentation in Allegiance's numbers:[2]

> I am a CPA. I am generally familiar with all sorts of frauds. . . . That's not what this is. And I don't see any evidence and have not and did not when I was at Allegiance when we crawled all over their company. We never found a thing.

---

[1] Lead Plaintiffs also attempt to certify the class based on claims not alleged in their Amended Complaint, e.g., the accounting claims. These claims cannot support a class. *Anderson v. U.S. Dept. of Housing and Urban Development*, 554 F.3d 525, 529 (5th Cir. 2008) (vacating the district court's certification order because it certified the class based on claims not pleaded in the complaint).

[2] A misrepresentation and scienter are necessary and independent elements of fraud. A misrepresentation is an incorrect or wrong statement or number. Scienter requires proof of intent to mislead. Thus, if the record reflects that no "fraud" occurred, logic proves that no misrepresentation occurred, without having to inquire into scienter.

> These guys were honest as the day is long from when we were there. And I was on the other side of the table from them and I had a client that if there was something there, we had better found it. All right? That's not what this is. . . . This is a correction of the metric of line counts because they had a disconnect between -- in the manual processes between these systems. They upgraded the system and they made the change. So I -- I'm very familiar with accounting fraud. I have investigated it. I've been involved in cases where people confessed fraud to me. I know it when I see it. That's not what this is.[3]

### 3. The reconciliation statement merely confirmed what the market had known for 90 days.

The reconciliation statement in the 4Q01 press release was confirmatory, not revelatory. It cannot prove loss causation because markets do not react to information they already know.[4] *Flowserve*, 2009 WL 1740648, *9; *In re Williams Sec. Litig.*, 558 F.3d 1130, 1139 (10th Cir. 2009). In the 4Q01 press release, Allegiance announced "significant progress in its *continuing program* to automate manual processes . . . . to improve database consistency and integrity." It also announced a "negative adjustment" to its 4Q01 total lines figure. This "negative adjustment" is the precise 4Q01 risk Allegiance announced in its 3Q01 Form 10-Q, filed November 14, 2001:[5]

> We are in the process of introducing a new billing platform . . . . Since our inception, we have also been engaged in developing and integrating our essential information systems consisting of our billing system, our sales order entry system, our customer implementation system and our switch information systems. This is a challenging project because these systems were developed by different vendors . . . . Our sales, line count and other core operating and financial data are generated by these systems and the accuracy of this data depends on the quality and progress of the system integration project. **Although we have made significant progress in our system integration efforts, we have not completed it and we have experienced and expect to experience *negative adjustments* to our financial and operating data as we complete this effort . . . .**

When Allegiance issued the 4Q01 release in February 2002, the market had known of the risk of a negative adjustment for 90 days. Thus, the 4Q01 press release is a confirmatory statement.

---

[3] *See* Exh. A to D. Supp. Sub. at 0023 [Dkt. No. 189], Dep. of Carlyn Taylor at 89:16-90:11.
[4] This is all the more relevant in light of Judge Sanders's ruling dismissing all claims based on the database reconciliation. He allowed only allegations on "forged contracts" and "delayed disconnects" to proceed. But plaintiffs provided no evidence linking any number in 1Q01, 2Q01, 3Q01, and any statement in the 4Q01 press release with these topics. Without an evidentiary link, these also fail to support class certification.
[5] The Court can take judicial notice of this 10-Q. *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir.1996) (judicial notice taken of public disclosure documents filed with the SEC in securities fraud claim).

**4. The 4Q01 press release does <u>not</u> sufficiently relate to the alleged fraud.**

The statement about the database reconciliation in Allegiance's 4Q01 press release does *not* relate to the statements in 1Q01, 2Q01, and 3Q01 press releases about lines installed. While both deal with "lines," a finding on that loose association alone fails under Fifth Circuit precedent. In *Greenberg v. Crossroads Systems, Inc.*, 364 F.3d 657 (5th Cir. 2004), the plaintiffs claimed that a disclosure about routers revealed that Crossroads misrepresented prior facts about routers. But the Fifth Circuit required a stronger tie between the culpable statement and the revelatory statement (*speed* of routers v. *interoperability* of routers). *Id.* at 667-69. Similarly, in *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009), the plaintiffs claimed that disclosures about the effects of US Unwired's relationship with Sprint revealed that US Unwired misrepresented the effect of its relationship with Sprint. But the Fifth Circuit required a stronger tie between the culpable statement and the revelatory statement (conversion to a Type II affiliation with Sprint v. the subprime market Sprint forced US Unwired to enter). *Id.* at 259–60.

Here, the 1Q01, 2Q01, and 3Q01 statements outline the continued trend in selling and installing more lines — a trend that continued in 4Q01. The 4Q01 release announced the revenue-neutral results of the database-reconciliation project it had already disclosed after 3Q01 — a reconciliation of four databases, each developed by a separate vendor, which employed different methodologies to address lines. Nothing in the 1Q01, 2Q01, or 3Q01 releases relates to Allegiance's choice of database. And a database reconciliation across four internal systems does not relate to publicly-reported, accurate numbers of lines installed listed in one system. Also, the 4Q01 release did not suggest that the installed-lines figures announced in 1Q01, 2Q01, or 3Q01 were incorrect, because the figures were not incorrect. Indeed, the total number of lines installed from Allegiance's inception through 4Q01 were adjusted downward in 4Q01 on a going-forward basis, not retroactively.[6] The figures were adjusted to reflect the changing technology from

---

[6] *See* Exh. F to Defs.' Opp., Excerpt from 2001 Form 10-K at D. App. 0190. [Dkt. No. 125].

single-channel lines in the order management system to multiple-channel lines in the new billing system. The 4Q01 release concerns 4Q01, not 1Q01, 2Q01 or 3Q01.[7] Lead Plaintiffs fail to establish loss causation because they do not prove that the 4Q01 "disclosure" relates to the 1Q01, 2Q01, and 3Q01 statements.

**5.   Unrelated news caused Allegiance's stock price to drop.**

To prove loss causation, Lead Plaintiffs must establish that the stock-price drop was not the result of changed economic circumstances, new industry-specific facts, or other factors independent of the fraud. *Flowserve*, 2009 WL 1740648, *6. The record shows that Allegiance announced myriad negative financial information into a market meltdown, and a chain reaction caused the stock-price drop. The telecom industry melted down in 2001-02, exacerbated by the September 11, 2001 terrorist attacks.[8] Allegiance's stock was in a free fall throughout the class period, dropping from $40.00 on January 11, 2001 to $3.70 on February 19, 2002 – an 81% decline. Over 150 telecom companies filed bankruptcy in 2000-2004, which caused many lenders to become rigid on lending covenants.[9] Further, Allegiance announced razor-thin margins for error on its lending covenants,[10] missed earnings per share, and EBITDA loss projections. These significant unrelated forces caused the stock price to drop.[11]

Therefore, the Court should deny Lead Plaintiffs' class-certification motion.

---

[7]   *See Greenberg*, 364 F.3d at 668 (February 2000 statements regarding 1Q00 financial results and 2Q00 analysts' earnings estimates did not relate to the July 2000 alleged disclosure regarding 3Q00 revenues).

[8]   *See* Exh. A to Defs.' Opp., Expert Report of Carlyn Taylor at D. App. 0006–9 [Dkt. No. 125] (noting the telecommunications industry meltdown); *In re Williams Secs. Litig.*, 558 F.3d at1135 (same); *In re Teleglobe Communications Corp.*, 493 F.3d 345, 354 n. 4 (3d Cir. 2007)(same).

[9]   *See* Exh. A to Defs' Opp., Expert Report of Carlyn Taylor at D. App. 0007-9 [Dkt. No. 125].

[10]   It is these exact market forces that were noted by lead plaintiff Brett Messing in a May 15, 2002 investor column on Allegiance. *Oscar Private Equity Inv. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 270-71 (5th Cir. 2007).

[11]   *See Greenberg*, 364 F.3d at 667, 69 (holding that in the face of more serious negative statements, a fact finder could not find that news regarding less serious information played a significant role in the price decline).

Dated July 29, 2009

        Respectfully submitted,

        <u>  s/ Timothy R. McCormick  </u>
        Timothy R. McCormick
        Texas Bar No. 13463500

        William L. Banowsky
        Texas Bar No. 01697125

        Michael W. Stockham
        Texas Bar No. 24038074

        Jill C. Penn
        State Bar No. 24051181

        **THOMPSON & KNIGHT LLP**
        1722 Routh Street, Suite 1500
        Dallas, Texas  75201
        Telephone: (214) 969-1700
        Facsimile: (214) 969-1751

        **ATTORNEYS FOR ROYCE J. HOLLAND AND ANTHONY PARELLA**

### CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2008, I electronically filed the foregoing document with the clerk for the United States District Court for the Northern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record, who have consented in writing to accept this Notice as service of this document by electronic means.

        <u>  s/ Jill Campbell Penn  </u>

506298 000002 DALLAS 2515974.2